1999-NMSC-027

982 P.2d 477

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Ramone STAMPLEY, Defendant–
Appellant.**

**No. 24,184.**

Supreme Court of New Mexico.

May 19, 1999.

Phyllis H. Subin, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Appellant.

Hon. Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

BACA, Justice.

{1} Pursuant to Rule 12–102(A)(1) NMRA1999, Appellant Ramone Stampley ("Stampley") seeks review of his conviction for first degree murder, attempted first degree murder, drug trafficking, and aggravated assault. On appeal, we examine the following issues: 1) whether the trial court should have suppressed both in-court and out-of-court identifications as impermissibly suggestive; 2) whether the trial court erred in allowing the State to present hearsay evidence; 3) whether substantial evidence exists to support Stampley's drug trafficking conviction and 4) whether Stampley may have been convicted of a nonexistent crime—attempted depraved mind murder. We affirm in regard to the first three issues but reverse Stampley's conviction for attempted first degree murder and remand for a new trial on the charge of attempted first degree murder by deliberate killing, with the lesser included offense of attempted second degree murder by intentional killing and voluntary manslaughter.

## I.

{2} On the evening of September 22, 1995, after drinking alcohol and smoking marijuana and crack cocaine, nine young people drove a Chevy Blazer from Los Lunas to Albuquerque. Marie Martinez, age thirteen, was driving. When the group reached the area of Broadway and Dan in Southeast Albuquerque, Gary Call and Alberto LeChuga exited the vehicle and purchased some crack cocaine while Marie drove around the block. After the group finished smoking the crack cocaine, they drove back to the same corner to purchase more.

{3} Gary exited the vehicle, talked to a woman and she handed him three rocks that appeared to be crack cocaine. In exchange, Gary handed the woman five one-dollar bills trying to pass them off as five ten-dollar bills. Gary then came running back to the vehicle with an African–American man chasing him. The African–American man began shooting and before he reached the vehicle, he shot out the right middle, window on the passenger's side. He fired several more shots while standing at the window until Marie was finally able to drive away. When the shooting ended, two passengers in the vehicle, Alberto LeChuga and George Ibuado, were dead, and Gary was injured.

{4} Shortly after the shooting, Carmelita Brisco, another passenger in the vehicle who was sitting next to one of the victims, described the assailant to the police and worked with a computer artist to develop a sketch. Carmelita also viewed video tape of the same location as the shooting taped several days prior to the incident by an area resident. From the tape, she identified Miranda Lowry as the drug dealer who had sold Gary the crack cocaine. Another woman, Albeni Walker, also appeared on that tape.

{5} On September 27, 1995, detectives showed Carmelita and Marie a photographic array. The array did not contain the Defendant Stampley's picture. Marie tentatively identified number four as the assailant, and Carmelita did not identify anyone.

{6} On October 19, 1995, detectives showed Carmelita, Marie, and Gary another photographic array in which Stampley's photograph appeared in the second position. Detectives showed Carmelita and Marie the array at the police station and showed Gary the array while he was still in the hospital.

{7} When Carmelita viewed the pictures, she tentatively identified number two, Stampley, as resembling the shooter. She then signed the identification form indicating that she was unsure, but then appeared noticeably upset. Detectives asked her why she was upset. She testified that she then told detectives that she was upset because she had lied when she said she was unsure and was actually positive that number two was the shooter. Carmelita also testified that she did not feel pressured to pick anybody out of the array.

{8} When Marie first looked at the second photographic array she did not immediately recognize anyone. Detectives asked her if she was sure and if she wanted to take her time to look again. Marie then indicated that number two, Stampley, resembled the shooter but that she was not positive.

{9} A detective showed Gary the photographic array twice on the same day. The first time he saw the array, Gary immediately pointed to Stampley's photograph. However, the detective did not have Gary fill out a photographic identification form at that time, but returned to the hospital a couple of hours later and asked Gary if he remembered her visit and choosing a photograph. He said that he did and filled out a form indicating that photo number two, Stampley, resembled the shooter, but that he was not positive.

{10} On February 23, 1996, Stampley was charged with first degree murder, attempted first degree murder, and two counts of aggravated assault. Stampley turned himself in to authorities in California, waived extradition, and returned to New Mexico to face charges stemming from the shooting incident.

{11} On August 21, 1996, Stampley moved to suppress any testimony regarding the photographic array identifications by Gary, Carmelita, and Marie. Stampley also moved to suppress any in-court identification

of him, arguing that any such identification would be tainted. The court denied Stampley's motion and set the matter for trial on September 3, 1996. At trial, Gary was the only witness to provide an in-court identification of Stampley as the assailant.

{12} On September 17, 1996, a jury found Stampley guilty of one count of first degree depraved mind murder, one count of first degree intentional and deliberate murder, one count of attempted first degree murder, one count of drug trafficking, and two counts of aggravated assault with a deadly weapon. The court sentenced Stampley to a term of life imprisonment for each murder conviction, nine years for attempted murder, plus one year for a firearm enhancement, nine years for trafficking, and eighteen months enhanced by one year for each assault with a deadly weapon conviction, for an overall sentence totaling eighty-four years in prison. Pursuant to Rule 12–102(A)(1), Stampley appealed his conviction to this Court.

## II.

{13} We first address Stampley's argument that the trial court should have suppressed both the out-of-court and in-court identifications. Stampley argues that the pretrial identification procedures were impermissibly suggestive and gave rise to a substantial likelihood of misidentification. Likewise, he argues that the in-court identification was tainted because it was dependent on those suggestive pretrial identification procedures. After careful review, we agree with the district court's finding that the photographic identifications were not impermissibly suggestive.

## A.

{14} In determining whether an identification is impermissible, "[w]e must analyze whether the photo array was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and, if so, 'under the totality of the circumstances,' whether the identification was nonetheless reliable." *State v. McGruder,* 1997–NMSC–023, ¶ 34, 123 N.M. 302, 940 P.2d 150 (quoting *State v. Clark,* 104

N.M. 434, 439, 722 P.2d 685, 690 (Ct.App. 1986)).

{15} Stampley claims that differences among the photographs in the array and circumstances surrounding the presentation of the array render it suggestive. He bases his argument on the following factors: 1) race—Stampley is African–American and none of the witnesses were African–American; 2) posture—Stampley was the only person in the array with his head tilted back in the photograph; 3) clothing—Stampley was the only person in the array with only a T-shirt showing in the photograph; and 4) body build—Stampley and the person in photograph number four seemed heavier or stockier in build than the others. We do not find anything in the record to indicate that these differences in the photographs or the presentation of the array render it impermissibly suggestive.

{16} In *Clark,* a male Caucasian defendant claimed that a photographic array was impermissibly suggestive because he was the oldest of the nine subjects depicted and he was the only person smiling. *Clark,* 104 N.M. at 439, 722 P.2d at 690. He also pointed out that two photographs were taken horizontally, one photograph was out of focus, and each subject depicted had distinguishing characteristics such as looking up or having a dimple, a mole, or a menacing look. *See id.* The defendant claimed that these differences rendered the photographic array impermissibly suggestive. The Court of Appeals disagreed and held that defendant's argument lacked merit because all the photographs were of male Caucasians around the same age of the defendant and like the defendant, lacked any facial hair. *Id.*

{17} All of the subjects in the photographic array in which Stampley's photograph appeared were of the same race, age, and stature. Each photograph in the array depicted a young African–American male with short hair and very little facial hair. Nothing exists in the record to suggest that the differences in posture, clothing, and body build were impermissibly suggestive. *See id.* 104 N.M. at 439, 722 P.2d at 690; *see also State v. Vaughn,* 199 Conn. 557, 508 A.2d

430, 433 (1986) ("Any array composed of different individuals must necessarily contain certain differences."), *quoted in State v. Austin,* 244 Conn. 226, 710 A.2d 732, 745 (1998).

{18}   Finally, we find no basis for and do not accept Stampley's argument that because he is of a different race than the witnesses who identified him that the identifications were impermissibly suggestive. Stampley has not presented any evidence indicating that this difference resulted in an impermissibly suggestive photographic array.

### B.

{19}   Stampley also argues that the manner in which the police showed the photographic array to the witnesses rendered them impermissibly suggestive. Stampley's argument focuses on the questions detectives asked after the witnesses identified Stampley as resembling the assailant. He contends that the questions implicitly encouraged the witnesses to choose his photograph thereby tainting the identifications. We disagree.

{20}   In *Clark,* the defendant also argued that the manner in which the police showed a photographic array to the witness and the detective's behavior while questioning a witness rendered an identification impermissibly suggestive. 104 N.M. at 439–40, 722 P.2d at 690–91. There, a detective handed the victim-witness, a child, photographs one at a time. *Id.* at 440, 722 P.2d at 691. After the witness identified the defendant, the detective asked her if she was sure. *Id.* The victim answered yes and the detective then hugged the witness. The record did not show that the detective made any suggestions while showing the photographs. *Id.* The Court of Appeals held that there was nothing impermissibly suggestive with the procedures used and that the defendant's arguments lacked merit. *Id.*

{21}   Here, the detective asked Carmelita why she was upset after she had already identified Stampley. Stampley claims this question was implicitly suggestive. Additionally, when Marie did not immediately recognize anyone in the array, the detectives asked her if she was sure and to take her time and look again. Stampley claims this action implicitly encouraged Marie to choose his picture. Finally, Stampley claims that the manner in which the detective showed Gary the photographic array was suggestive because Gary may have been medicated, was shown the same array twice in the same day, and did not fill out an identification card until he viewed the array the second time. He also claims that Gary was generally "suggestible." We disagree with Stampley's claims.

{22}   The detectives in this case were merely attempting to clarify the witnesses' responses. The questions asked and procedures used " 'could very properly suggest care on the part of the officer in making certain the identification by the victim was a correct one .' " *State v. Self,* 88 N.M. 37, 39, 536 P.2d 1093, 1095 (Ct.App.1975) (citing *State v. Aguirre,* 84 N.M. 376, 379, 503 P.2d 1154, 1157 (1972)). The detectives questioned the witnesses' certainty. They did not make any suggestions, apply any pressure, or implicitly encourage the witnesses to choose any particular photograph. *Cf. Moore v. State,* 984 S.W.2d 783, 789 (Tex.App.1999) (stating that "[a]n out-of-court identification procedure may be impermissibly suggestive when the photo array only includes one individual who closely resembles the pre-procedure description ... [or] when the police suggest that the suspect is included in the line-up or photo array"). In addition, since the detective did not make any implicit suggestions, Stampley's claim that Gary was suggestible is irrelevant.

### C.

{23}   Even if we had held that the procedures involved in the witnesses' identification of Stampley were impermissibly suggestive, we believe that the totality of circumstances would nonetheless support the reliability of the identifications. *Cf. Salgado,* 1999–NMSC–008, ¶ 22, 126 N.M. 691, 974 P.2d 661. In determining whether an identification is reliable, we look at the totality of the circumstances and consider the following factors: 1) the witnesses' opportunities to view the assailant at the time of the crime; 2) the witnesses' degrees of attention; 3) the accuracy of the witnesses' descriptions of the

criminal; 4) the witnesses' levels of certainty demonstrated at the confrontations; and 5) the time between the crime and the confrontations. *See State v. Baca*, 99 N.M. 754, 758, 664 P.2d 360, 364 (1983).

**1.**

{24} Stampley argues that Carmelita, Marie, and Gary's identifications were unreliable because they did not have ample opportunity to view the assailant. We disagree. Carmelita was in the back-seat of the vehicle next to one of the victims when the incident occurred. She testified that she saw the shooter's face through the open window from the time he reached the vehicle to the time he shot Alberto LeChuga, who was inside the vehicle. Marie also had an opportunity to view the shooter because she was sitting in the driver's seat and the shooter pointed the gun directly at her while telling her not to leave. Gary also looked directly at the shooter's face before and after he was shot. Given these circumstances, the witnesses had ample opportunity to view the assailant.

{25} Stampley also claims that the witnesses' identifications were unreliable because they only saw him for two or three seconds. The State claims that the witness saw the assailant for up to thirty seconds. The question whether the witnesses saw the shooter for a couple of seconds or up to thirty seconds does not, on its face, affect the reliability of the identification. Only a few seconds can be adequate to make a photographic identification reliable. Moreover, this is a matter for the jury to decide. *See State v. Ortega*, 112 N.M. 554, 574, 817 P.2d 1196, 1216 (1991) (holding that whether an identification was unreliable where the witness has observed the assault for only a few seconds "was a matter for decision by the jury in its evaluation of the evidence").

**2.**

{26} Stampley also argues that the identifications were unreliable because Carmelita and Gary were under the influence of both drugs and alcohol, which compromised their ability to concentrate. We disagree. Although it is disputed how intoxicated Gary and Carmelita actually were, the consumption of alcohol does not automatically render the person's degree of attention unreliable. Here, although admittedly intoxicated, the effect of drugs or alcohol did not appear to detract from Carmelita's and Gary's degree of attention. Carmelita testified that at the time of the shooting, she was not feeling the effects of any drugs or alcohol. Gary also testified that smoking the crack cocaine only made him feel more alert. In this case, both Gary and Carmelita testified that they looked directly at the shooter and appeared to have focused their attention on him. Moreover, this is a matter best determined by the jury. *See State v. Cheadle*, 101 N.M. 282, 286, 681 P.2d 708, 712 (1983) (stating that the accuracy of the identification is a question for the jury.)

**3.**

{27} Stampley also contends that the witnesses' descriptions of the shooter contradicted each other and thus do not support a finding that the photographic identifications were reliable. We disagree. In this case, although some minor differences existed, the descriptions each witness provided were similar to each other and to Stampley's physical appearance. *See People v. Montanez*, 944 P.2d 529, 531 (Colo.Ct.App.1996) (holding "that the discrepancy between the physical description given and the characteristics of defendant—5'10" to 6' and 150 to 160 pounds v. 5'7" and 140 pounds—is not so great as to mandate a finding of inaccuracy"), *rev'd in part on other grounds*, 966 P.2d 1035 (Colo.1998). Here, all three described the shooter as a young, light-complected African–American man with short hair or a shaved head and consistently chose the same photograph out of the array. Moreover, this is also a question best determined by the jury. *See Cheadle*, 101 N.M. at 286, 681 P.2d at 712.

**4.**

{28} Stampley also argues that the differences between the two composite drawings made after the shooting, his photograph in the array, and Carmelita's and Marie's photographic identifications, demonstrate the

witnesses' lack of certainty and thus render their identifications unreliable. We do not see how these differences could render the identifications unreliable. Marie's composite drawing resembled Stampley. Carmelita stated that the sketch made from her description did not look like the shooter and the drawing did not adequately reflect her level of certainty. Thus, the difference between the drawings and Stampley's appearance do not render the identifications unreliable.

### 5.

{29} Stampley also claims that the identifications were unreliable since almost a month had elapsed from the time of the shooting to the time of the photographic identifications. We disagree. A one-month lapse of time is not unreasonable, particularly under these circumstances where the witnesses had an opportunity to view the shooter and where their attention at the time was focused directly on the shooter. *Cf. Rodriguez v. Peters,* 63 F.3d 546, 557 (7th Cir.1995) (concluding that a nine month lapse of time did not render an identification unreliable); and *United States ex rel. Clark v. Fike,* 538 F.2d 750, 755 (7th Cir.1976) (discussing a five month lapse of time).

### D.

{30} Finally, Stampley claims that Gary's in-court identification was unreliable because he was the only witness that identified him in court and that Gary only became positive about his identification after he saw Stampley on television and in the newspaper. Stampley also claims that Gary was biased because the State was offering him leniency on pending burglary charges in exchange for his testimony. Finally, Stampley argues that because he was the only African–American person in the courtroom and was seated at counsel's table, the in-court identification was impermissibly suggestive. We disagree with Stampley's claims.

{31} The in-court identification was "independent of, and not tainted by the extra-judicial identification". *Clark,* 104 N.M. at 439, 722 P.2d at 690. Since, as we discussed earlier, nothing exists to indicate that the pre-trial identification procedures were undu-

ly suggestive, they could not taint any subsequent identification. *Cf. id.* at 440, 722 P.2d at 691.

{32} We are not persuaded by Stampley's argument that Gary's in-court identification was tainted by seeing Stampley on television and in the newspapers. Although Gary testified that he recognized Stampley when he saw him on television and in the newspapers, his recognition was based on his memory of the shooting. Gary's in-court identification was consistent with that memory. Thus, we do not see how it could have "tainted" his identification and rendered it unreliable. *See Cheadle,* 101 N.M. at 285, 681 P.2d at 711 (holding an in-court identification admissible notwithstanding the fact that the witnesses, who had identified a defendant from a photo array, had seen the defendant's picture on either television or in the newspaper).

{33} We also reject Stampley's claim that Gary's in-court identification was unreliable because he was biased since the State was purportedly offering him leniency on pending burglary charges in exchange for his testimony. Gary was facing a burglary charge in Valencia County and any plea discussion was with the Valencia County District Attorney's office, not the Bernalillo County District Attorney's office. Moreover, at the time that Gary testified, any plea offer that he was aware of was not finalized. Finally, Stampley did not offer any evidence that Gary testified in exchange for leniency. Stampley's counsel only alluded to the fact that he was getting a "good deal" considering Gary was a habitual offender and would benefit from a plea agreement which substantially reduced his potential jail time.

{34} The jury alone is the judge of the credibility of the witnesses and determines the weight afforded to testimony taking into account, among other things, any biases or prejudices the witness may have. *See* UJI 14–5020 NMRA1999. Here, the jury had sufficient information to make a discriminating appraisal of Gary's potential bias and motive for testifying. *Cf. State v. Sanders,* 117 N.M. 452, 460, 872 P.2d 870, 878 (1994) (concluding that exclusion of evidence con-

cerning the content of a polygraph exam did not constitute error because the jury had sufficient information to evaluate credibility given the witness's admission that she had lied on an earlier occasion). Thus, we will not disturb the jury's determination, and we reject Stampley's argument that Gary's alleged bias rendered his in-court identification unreliable.

{35} Finally, we hold that Gary's in-court identification was not rendered suggestive solely because Stampley was the only African–American in the courtroom. *See Lacy v. Lockhart*, 697 F.2d 271, 272–73 (8th Cir.1983) (per curiam) (stating that an in-court identification is not impermissibly suggestive simply because the defendant is the only black person in the courtroom); *Manning v. State*, 162 Ga.App. 494, 292 S.E.2d 95, 96 (1982) (holding that in-court identification was not impermissibly suggestive although defendant was the only black male present in the courtroom at the time of the identification); *People v. Clark*, 52 Ill.2d 374, 288 N.E.2d 363, 370 (1972) (rejecting claim that identification was inadmissible because defendant was only black male at defense table).

### III.

{36} Next, we address whether the trial court abused its discretion by allowing the State to present hearsay evidence that Abeni Walker and other unnamed persons identified Stampley as the assailant. Stampley objects to the out-of-court statement that the State introduced through the testimony of Detective Gandara on re-direct examination. The State asked Detective Gandara whether she had information that Stampley was the shooter. The detective testified that she had received information from Abeni Walker, who also appeared on the video tape taken by an area resident, and other unknown informants that Stampley was the shooter. The trial court admitted the statement for the limited purpose of rebutting Stampley's claim that Detective Gandara was biased and failed to investigate properly. Stampley argues that the court abused its discretion in admitting the statement, claiming that it was inadmissible hearsay.

{37} "This Court reviews the trial court's determination of whether testimony is within exceptions to the hearsay rule for an abuse of discretion." *State v. Salgado*, 1999–NMSC–008, ¶ 5, 126 N.M. 691, 974 P.2d 661. "Admission or exclusion of evidence is a matter within the discretion of the trial court and the court's determination will not be disturbed on appeal in the absence of a clear abuse of that discretion." *State v. Valdez*, 83 N.M. 632, 637, 495 P.2d 1079, 1084 (Ct.App.), *aff'd*, 83 N.M. 720, 497 P.2d 231 (1972).

{38} All relevant evidence is generally admissible unless otherwise provided by law. *See* Rule 11–402 NMRA 1999. However, relevant evidence otherwise admissible may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evidence is relevant if it tends to make a fact in issue more or less probable but any doubt should be resolved in favor of admissibility. *See* Rule 11–403 NMRA1999; *Brown v. General Ins. Co. of Am.*, 70 N.M. 46, 54, 369 P.2d 968, 973 (1962) ("In doubtful cases the doubt should be resolved in favor of ... admissibility."). Finally, "the complaining party on appeal must show the erroneous admission and exclusion of evidence was prejudicial in order to obtain a reversal." *Cumming v. Nielson's, Inc.*, 108 N.M. 198, 203–04, 769 P.2d 732, 737–38 (Ct. App.1988); *accord State v. Jett*, 111 N.M. 309, 312, 805 P.2d 78, 81 (1991); *see generally* Rule 11–103(A) NMRA1999 (requiring a detriment to a substantial right of a party before an evidentiary ruling may be considered error)..

### A.

{39} Out-of-court statements that are not offered for the truth of the matter asserted do not fall within the definition of hearsay. *See* Rule 11–801(C) NMRA1999 (defining hearsay). With respect to out-of-court statements offered to explain the basis for a police investigation, the Court of Appeals has previously stated that such evidence can be "extremely prejudicial testimony," *State v. Alberts*, 80 N.M. 472, 475, 457 P.2d 991, 994 (Ct.App.1969), and "is clearly inadmissable as a part of the

State's case in chief, *id.* at 474, 457 P.2d at 995. *See State v. Montoya,* 114 N.M. 221, 836 P.2d 667 (Ct.App.1992)." However, statements supporting the reasonableness of a detectives' conduct may be admissible if relevant to a fact of consequence and not offered to prove the truth of the matter asserted. *State v. Apodaca,* 118 N.M. 762, 771, 887 P.2d 756, 765 (1994); *Alberts,* 80 N.M. at 475, 457 P.2d at 994 ("[T]he evidence must be consistent with a legitimate purpose and have some proper probative effect upon an issue in the case."). Stampley challenged Detective Gandara's motive for investigating him as a suspect. In addition, Stampley questioned the reasonableness of Detective Gandara's investigation. On cross-examination, Stampley insinuated that Detective Gandara ignored other possible suspects. In particular, he focused on the fact that Detective Gandara did not show the witnesses a different photo array prepared by another officer that included a suspected drug dealer from the area. Thus, unlike the evidence at issue in *Alberts* and *Montoya,* Detective Gandara's testimony was offered on rebuttal for the legitimate rebuttal purpose of refuting Stampley's suggestions of bias and baseless judgments and was limited in detail and extent. Thus, the trial court did not err in admitting Detective Gandara's testimony about Abeni Walker and other unknown informants that Stampley was the shooter because it explained Detective Gandara's state of mind at the time of the investigation and refuted Stampley's claim that she was biased against him. *See State v. Johnson,* 99 N.M. 682, 687, 662 P.2d 1349, 1354 (1983). Moreover, Stampley has not proved that he was prejudiced since the evidence was cumulative to the testimony of three witnesses, Gary, Carmelita, and Marie, who had identified him as the shooter. *See State v. Crain,* 1997–NMCA–101, ¶ 29, 124 N.M. 84, 946 P.2d 1095 (stating that hearsay evidence is insufficiently prejudicial if it is cumulative of other evidence). Therefore, we hold that the trial court did not abuse its discretion by allowing the State to present evidence that Abeni Walker and unnamed people identified Stampley as the assailant.

### B.

■ {40} Stampley also argues that the trial court abused its discretion by allowing Detective Gandara to testify that she had attempted, without success, to contact a homicide detective in Wichita, Kansas, who had investigated Stampley's alibi. Stampley claims that this evidence also was inadmissible hearsay. We disagree.

{41} The evidence that Stampley objects to was not hearsay but rather was a response to appropriate questions at trial and was not offered for the truth of the matter asserted. The evidence was offered to prove that Detective Gandara was reasonable in pursuing her investigation of Stampley as the assailant, a fact that Stampley challenged. *See Johnson,* 99 N.M. at 687, 662 P.2d at 1354. At trial, the prosecutor asked Detective Gandara if Wichita authorities had sent her any information that verified Stampley's alibi. Detective Gandara answered, "None whatsoever." Finally, the evidence was not an out-of-court statement, but was nonverbal conduct, that of Detective Gandara and the Wichita police. Nonverbal conduct is generally not hearsay. *See* Rule 11–801(A)(2) NMRA1999; *Jim v. Budd,* 107 N.M. 489, 491, 760 P.2d 782, 784 (Ct.App.1987) (stating that implied assertions are not hearsay). Moreover, since the trial court limited consideration of the testimony for that purpose, it was not prejudicial.

### IV.

■ {42} Next, we address Stampley's argument that sufficient evidence did not exist to show that the rocks that Gary stole were crack cocaine. We resolve all disputed facts in favor of the State, allowing all reasonable inferences in support of the verdict and disregarding all evidence and inferences to the contrary. *See State v. Baca,* 1997–NMSC–059, ¶ 14, 124 N.M. 333, 950 P.2d 776. Here, sufficient evidence existed that the rocks were in fact crack cocaine. Gary testified that he recognized the rocks as crack cocaine. Contrary to Stampley's contentions, the State need not introduce scientific evidence to prove the identity of a controlled substance. *See United States v. Sanchez DeFundora,* 893 F.2d 1173, 1175

(10th Cir.1990). In this case, Gary testified that he had previously used crack and that he recognized the rocks from the incident in question as crack cocaine. *See State v. Rubio,* 110 N.M. 605, 607, 798 P.2d 206, 208 (Ct.App.1990) (holding that witness's experience as a successful cocaine dealer qualified him to give his opinion that the substance was cocaine); *United States v. Harrell,* 737 F.2d 971, 978–79 (11th Cir.1984) ("Identification based on past use coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance."). In addition, Carmelita testified that the group had purchased three rocks of crack cocaine from the same person earlier that night for forty dollars and that, after smoking the substance, she became hyper and alert. *See Sanchez DeFundora,* 893 F.2d at 1176 (discussing expected effects from use); *Harrell,* 737 F.2d. at 978 (discussing lay experience based on a high sales price). Thus, the jury had sufficient circumstantial evidence to conclude that the substance was crack cocaine.

## V.

■ {43} Finally, we address Stampley's argument that his right to due process was violated because the jury may have convicted him of a nonexistent crime—*attempted depraved mind murder. See State v. Johnson,* 103 N.M. 364, 368, 707 P.2d 1174, 1178 (Ct.App.1985) (holding that a person cannot intend to commit an unintentional killing such as depraved mind murder). Stampley argues that the instructions were vague since they were capable of two interpretations. We agree.

■ {44} A jury instruction is flawed and can constitute reversible error when it is erroneous, vague or contradictory with other instructions. *See State v. Parish* 118 N.M. 39, 41–42, 878 P.2d 988, 990–991 (1994). In *Parish* this Court explained the circumstances when flawed instructions constitute reversible error.:

> [I]f a an instruction is facially erroneous it presents an incurable problem and mandates reversal. On the other hand, if a jury instruction is capable of more than one interpretation, then the court must

next evaluate whether another part of the jury instructions satisfactorily cures the ambiguity. Finally, if the jury is given two contradictory instructions, each of which is complete and unambiguous, reversible error occurs because it is impossible to tell if the error is cured by the correct instruction; furthermore, there is no way to determine whether the jury followed the correct or incorrect instruction. The standard against which the court makes its determination [as to ambiguity] is that of a reasonable juror. Reversible error arises if, under the principles just described, a reasonable juror would have been confused or misdirected.

*Id.* (internal citations omitted).

{45} In this case, as to Gary Call, the State initially charged Stampley in the alternative with attempted first degree murder or attempted first degree depraved mind murder. At the beginning of the trial, the jury was advised of this alternative open count. The trial court ultimately dismissed the attempted first degree depraved mind murder charge. However, the record does not indicate that the jury was advised that this charge no longer stood.

{46} When the jury received its instructions, Jury Instruction 16 explained to the jury that to find Stampley guilty of attempted first degree murder, the jury would have to find, among other things, that "the defendant intended to commit the crime of First Degree Murder but failed to commit the First Degree Murder." However, the instruction did not define "first degree murder."

{47} The only instructions that contained a definition of first degree murder were those for Count 1 (the homicide of George Ibuado) and Count 2 (the homicide of Alberto LeChuga). These instructions defined "first degree murder" on two alternative bases— first degree murder by a deliberate killing (willful and deliberate) and first degree murder by an act greatly dangerous to the lives of the others indicating a depraved mind without regard for human life (depraved

mind). The instructions also defined "deliberate intention" and explained "deliberate killing." [1]

{48} We hold that because the jury had no alternative but to look to these instructions for the definition of "First Degree Murder" which contained a definition for "depraved mind" first degree murder, the jury could have convicted Stampley of Attempted Depraved Mind Murder, a nonexistent crime. The jury instructions were vague insofar as they were capable of at least two interpretations, one of which would have been erroneous. *See Parish,* 118 N.M. at 41, 878 P.2d at 990. Moreover, the other instructions did not clarify the ambiguity elsewhere but rather compounded the overall vagueness. *See id.* We conclude that the jury instructions as to Count 3 were so vague that a reasonable juror could have been confused or misdirected by the instructions and convicted Stampley of the nonexistent crime of attempted depraved mind murder of Gary Call. *See id.* Accordingly, we reverse Stampley's conviction for attempted first degree murder and remand for a new trial on the charge of attempted first degree murder by deliberate killing, with the lesser included offenses of attempted second degree murder by intentional killing and attempted voluntary manslaughter.

## VI.

{49} Based upon the foregoing discussion, we affirm the trial court's decision not to suppress both in-court and out-of-court identifications and allow the State to present hearsay evidence. Furthermore, we conclude that substantial evidence exists to support Stampley's drug trafficking conviction. We, however, reverse Stampley's conviction for attempted first degree murder and remand for a new trial on the charge of attempted first degree murder by deliberate killing, with the lesser included offenses of

attempted second degree murder by intentional killing and voluntary manslaughter.

{50} **IT IS SO ORDERED.**

MINZNER, C.J., FRANCHINI, SERNA and MAES, JJ., concur.

---

1. We also note that none of the instructions for Count 3 defined "second degree murder" or "voluntary manslaughter." Thus, just as the jury had to reference the instructions for Counts 1 and 2 to find the definition for "first degree murder," so too did they have to refer to the instructions for Counts 1 and 2 to find the definitions for "second degree murder" and "voluntary manslaughter."