# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

v.                                        **NO. 27,326**

**DONALD TOLBERT**,

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**J. Michael Kavanaugh, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
James W. Grayson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Susan Roth, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**ROBLES, Judge.**

Donald Tolbert (Defendant) appeals his felony convictions for two counts of criminal sexual contact of a minor (CSCM), kidnapping, bribery of a witness, and his misdemeanor conviction for battery. On appeal, Defendant raises sufficiency issues, as well as issues relating to hearsay, the denial of his motion for continuance, and the admission of evidence relating to Victim's special education classes. We affirm.

Defendant argues the evidence was insufficient to support his convictions for two counts of CSCM, kidnapping, and battery. We review the evidence to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Under this standard, "[w]e view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict." *State v. Hernandez*, 115 N.M. 6, 26, 846 P.2d 312, 332 (1993). We do not reweigh the evidence, nor substitute our judgment for that of the fact finder, so long as there is sufficient evidence to support the verdict. *Sutphin*, 107 N.M. at 131, 753 P.2d at 1319.

## I. CRIMINAL SEXUAL CONTACT OF A MINOR (CSCM)

We address first Defendant's convictions for two counts of CSCM. These convictions require substantial evidence that Defendant unlawfully and intentionally touched, or applied force to, Victim's breasts; that Victim was twelve years of age or younger; and that the incidents happened in the time frame between August 1 and September 30, 2002, and at a birthday party in August 2003. *See* NMSA 1978, § 30-9-13(A), (C)(1) (2003).

With regard to Defendant's CSCM conviction as charged in Count 2 of the indictment, Victim's mother testified that Defendant lived with her and Victim for three months between July and September 2002, at which time Victim was nine years old. Victim's mother testified that Defendant offered to, and did, read to Victim every night. Consistent with this, Victim testified that, during this time frame, Defendant would sometimes read her books or stories at night while sitting next to her on her mother's bed. Victim testified that "after when he read me the book," Defendant touched her breasts by "[c]ircling his hands around my breasts" and "put his hand down my shirt and touched my breasts . . . for three minutes or two." Victim testified that the touching happened "[e]very night when he read me a story" and occurred when her mother was in the living room or at work. Relevant to Defendant's CSCM conviction as charged in Count 5 of the indictment, Victim testified that she was at her

3

cousin's birthday party and was in the master bedroom picking up one of her cousin's toys when Defendant entered the bedroom. Victim testified that Defendant, while in the bedroom, touched her on her breasts over her clothes. At the time of the birthday party in August 2003, Victim was ten years old. Based on Victim's testimony, we hold that sufficient evidence supports Defendant's convictions for two counts of CSCM. *See State v. Sparks*, 102 N.M. 317, 320, 694 P.2d 1382, 1385 (Ct. App. 1985) (defining substantial evidence as that evidence which a reasonable person would consider adequate to support a defendant's conviction).

In an effort to cast doubt on the jury's verdict for the CSCM associated with the night time stories, Defendant asserts that Victim's testimony was "confused and discombobulated"; that the prosecutor asked leading questions; and that Victim's testimony was inconsistent regarding the frequency of times Defendant touched her breasts, as well as whether Defendant touched her breasts over her clothes or directly. Any inconsistencies in Victim's testimony, however, were matters for the jury to assess, and it was within the jury's prerogative to determine that Victim was credible. *See State v. Gonzales*, 1997-NMSC-050, ¶ 18, 124 N.M. 171, 947 P.2d 128 (holding that it is the fact finder's prerogative to weigh the evidence and to judge the credibility of the witnesses). Similarly, with regard to the CSCM at the birthday party, Defendant argues that Victim's testimony was not credible because other persons

4

came in and out of the master bedroom, and no witnesses saw Defendant and Victim in the master bedroom together. Again, however, it was a matter for the jury to weigh the testimony, assess any perceived inconsistencies, and disbelieve Defendant's version of the events. *Id.*; *see also State v. Huff*, 1998-NMCA-075, ¶ 11, 125 N.M. 254, 960 P.2d 342 (holding that although the defendant offered conflicting testimony, the jury is entitled to disregard the defendant's version of the facts).

## II. KIDNAPPING

We address next Defendant's conviction for kidnapping, which requires substantial evidence that Defendant restrained or confined Victim by force, intimidation, or deception, and that Defendant intended to hold Victim against her will to inflict death, physical injury, or commit a sexual offense in August 2003. *See* NMSA 1978, § 30-4-1 (2003). As provided in *State v. Pisio*, 119 N.M. 252, 260, 889 P.2d 860, 868 (Ct. App. 1994), "[t]he key to the restraint element in kidnapping is the point at which [the v]ictim's physical association with [the d]efendant [is] no longer voluntary."

The evidence relevant to the kidnapping conviction stems from Defendant's encounter with Victim in the master bedroom during the birthday party. As previously discussed, Victim testified that she went into the master bedroom to retrieve a toy. Victim testified that, while she was in the master bedroom, "[t]he door

closed and I turned to see why the door closed, because I thought maybe it was the wind or something," but then realized it was Defendant. Victim testified that Defendant closed the door, and that she and Defendant were the only two persons in the room. Victim also testified that, at some point, she went in the bathroom off the master bedroom "[t]rying to get away from [Defendant]."

Victim also testified that, after Defendant touched her on her breasts, she left the master bedroom. The prosecutor asked Victim about the circumstances of her exit from the bedroom, which we relate:

[PROSECUTOR]: Okay. Where was he? Was he in front of the door?

[VICTIM]: I really don't remember.

[PROSECUTOR]: Okay. If you wanted to, could you have just walked right out of there?

[VICTIM]: If he wasn't blocking it.

[PROSECUTOR]: Okay. So he was standing in your way?

[VICTIM]: Yeah.

Based on the foregoing, we hold that Defendant's act of assaulting Victim, and then subsequently blocking her exit from the bedroom, served to amplify Victim's initial understanding that she was not free to leave, thus continuing the unlawful detention that began when Defendant entered the room. *See State v. Huber*, 2006-NMCA-087, ¶ 23, 140 N.M. 147, 140 P.3d 1096 (holding that there was evidence that

the defendant confined the victim for kidnaping when he used his truck to block the victim from leaving his property); *State v. McGuire*, 110 N.M. 304, 308-09, 795 P.2d 996, 1000-01 (1990) (allowing the jury to infer from acts committed at some later point during the commission of a kidnapping that the defendant possessed the necessary criminal intent at the time the victim was first restrained). Although Defendant subsequently may have allowed Victim to pass by him, this does not negate a conclusion that he initially blocked Victim's exit as part of the ongoing detention.

Moreover, aside from any physical actions by Defendant to block Victim's passage, there was other evidence to show that Defendant had ensured Victim's continued detention by locking the door. In this regard, the lack of any direct evidence to show that Victim was aware the door was locked is irrelevant. *See State v. Garcia*, 100 N.M. 120, 124, 666 P.2d 1267, 1271 (Ct. App. 1983) (holding that whether the victim is aware that she is being kidnapped is not essential to prove kidnapping by deception, and kidnapping by deception may be proved by circumstantial evidence). Supporting the inference that Victim was not in the bedroom with Defendant voluntarily, Victim's aunt testified that it struck her as odd that Defendant and Victim were by themselves in the room behind a closed door because "[w]e had explained that to the girls before the party that we wanted that door

7

open and left open." The aunt also testified that she told her friend, who wanted to take her three-year-old son to the bathroom, that there was a bathroom in the master bedroom. The aunt testified that she observed her friend try to open the closed master bedroom door, and that her friend "knocked on the door and indicated that the door was locked." The aunt testified that, after the door opened, she saw Defendant leave the room, and that she knew Defendant and Victim had been in the room by themselves behind a closed door.

Another witness testified that she also needed to use the bathroom during the party, and proceeded to the master bedroom to use the bathroom. She testified that, when she tried to open the door to the master bedroom, it was locked. She testified that she was aware of "another [person] who was also there, [who] proceeded to do the same thing I did, went to the first [bathroom] and it was locked, went to the master bedroom [in an effort to access its bathroom], locked, and so she was knocking, knocking, knocking." She testified that from the time she first tried the master bedroom door and it was locked, until the time the door opened and Defendant came out, that "[a] good half hour" had elapsed. She testified that she recalled Defendant "just shooting out the door, coming out the hallway, shooting out of the front door." We hold that the jury could have reasonably inferred that Victim heard the witnesses

8

attempting to open the door, followed by knocking, and surmised that she was not free to leave the bedroom.

In sum, we hold that the evidence supports the jury's determination that the association between Defendant and Victim in the bedroom was involuntary, and that Defendant intended to hold Victim against her will from the time he entered the bedroom and closed and locked the door, culminating in Defendant blocking the door upon Victim's exit from the bedroom after the assault. *See State v. Foster*, 1999-NMSC-007, ¶ 32, 126 N.M. 646, 974 P.2d 140 (1999) (recognizing that "[o]nce [a] defendant [has] restrained the victim with the requisite intent to hold her for service against her will, he ha[s] committed the crime of kidnapping, although the kidnapping continue[s] throughout the course of [the] defendant's other crimes" (alterations in original) (internal quotation marks and citation omitted)); *Pisio*, 119 N.M. at 259, 889 P.2d at 867 (stating that "[b]ecause an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence"); *State v. Aguirre*, 84 N.M. 376, 381, 503 P.2d 1154, 1159 (1972) (stating that it is for the trier of fact to assess whether the defendant has the requisite intent that the victim be held to service against the victim's will). We recognize that Victim's testimony may have been inconsistent and contradictory, and that other witnesses's testimony differed regarding whether the bedroom door was locked. We recognize also Defendant's

assertion that the incident could not have occurred because other persons were constantly going in and out of the bedroom. These matters, however, were for the jury to weigh, and we will not reweigh the evidence, nor substitute our judgment for that of the jury. *See Sutphin*, 107 N.M. at 131, 753 P.2d at 1319.

Defendant, for the first time in his reply brief, suggests that Victim was not alone in the bedroom with Defendant for any longer than was necessary to commit the crimes of which he was charged. We first note that Defendant's argument, though made within the context of his challenge to the sufficiency of the evidence, is more in the nature of a double jeopardy challenge. *See generally State v. Crain*, 1997-NMCA-101, ¶ 21, 124 N.M. 84, 946 P.2d 1095 (providing that the force, restraint, or deception used to accomplish the kidnapping must occur either before or after the sexual assault and be factually distinct). Although new issues ordinarily should not be raised for the first time in the reply brief, *see State v. Fairweather*, 116 N.M. 456, 463, 863 P.2d 1077, 1084 (1993), we recognize that a double jeopardy challenge can be raised at any time. *See* NMSA 1978, § 30-1-10 (1963). Nevertheless, as noted above, there was testimony that Victim was confined in the bedroom with Defendant for at least thirty minutes. Moreover, Defendant can point to no evidence indicating that his assault on Victim was simultaneous to the actions he took in closing, locking,

and blocking the door. As such, we reject Defendant's contention that the force used to assault Victim was the same force used to effectuate the kidnapping.

## III. BATTERY

Defendant's conviction for battery requires substantial evidence that Defendant intentionally touched or applied force to Victim by French kissing her, and that Defendant acted in a rude, insolent, or angry manner. *See* NMSA 1978, § 30-3-4 (1963).

The evidence relating to the battery also took place at the birthday party. Victim testified regarding the French kissing during the following direct examination:

[PROSECUTOR]: Did [Defendant] do something to you at that party that you did not like?

[VICTIM]: Yes.

[PROSECUTOR]: What did he do?

[VICTIM]: I think he tried or did French kiss me.

[PROSECUTOR]: Let's talk about those things. You just said that he did or he tried to French kiss you; is that right?

[VICTIM]: I really don't know which it was.

[PROSECUTOR]: You mean you don't know if he did it or if he didn't do it?

[VICTIM]: Yeah.

[PROSECUTOR]: Did he try to do that to you then?

[VICTIM]: Yes, I think so. That was when he -- when we were at the pool.

[PROSECUTOR]: Okay. What is French kiss?

[VICTIM]: When -- ugh, I hate that part. When two tongues touch each other and they kiss.

[PROSECUTOR]: Okay. When two tongues touch each other and kiss?

[VICTIM]: Yeah.

[PROSECUTOR]: Was there anyone around when that happened?

[VICTIM]: No.

[PROSECUTOR]: How did that make you feel?

[VICTIM]: Very, very, very uncomfortable.

Defendant argues that the foregoing exchange establishes only that Defendant attempted to French kiss Victim, and that the evidence was such that it was equally consistent with an inference of innocence as guilt. We disagree, as a jury reasonably could have viewed any equivocation in Defendant's testimony to be with regard to whether or not Defendant's kiss fulfilled the requirements of a "French kiss" as opposed to a regular kiss. Once it was established that a French kiss involved Defendant touching Victim's tongue with his tongue, Victim's response indicated that Defendant did French kiss her and that it made her feel very uncomfortable. We thus hold that the evidence was such that a jury could reasonably infer that Defendant

12

French kissed Victim. *See generally State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 (holding that the appellate court views the evidence as a whole, and indulges all reasonable inferences in favor of the jury's verdict, and "does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence" (internal quotation marks and citation omitted)).

**IV.    HEARSAY**

Defendant argues that the district court erred in admitting an out-of-court statement that Victim made to her cousin, indicating that Victim was not happy that Defendant was coming to the birthday party because he had touched her inappropriately. Victim made the statement to her cousin on the day before her cousin's eighth birthday party. The next day as Defendant was arriving at the birthday party and knocking on the door, the cousin related the statement to her mother, Victim's aunt. In response, the aunt testified that "without knowing if it was true or not," she was not able to tell Defendant that he could not come in. However, the aunt did testify, as a result of the information provided by her daughter, that she decided to keep an eye on both Defendant and Victim during the party.

At trial, both Victim's cousin and aunt referred to Victim's statement during their direct examinations by the prosecutor, and Defendant raised a hearsay objection.

13

The district court overruled the hearsay objection on the basis that the statement was not offered to prove the truth of the matter asserted, and ruled that the statement was instead admissible for the limited purpose to show the effect that such statement had on its recipients. We review the district court's evidentiary ruling pursuant to an abuse of discretion. *See State v. Lopez*, 2000-NMSC-003, ¶ 10, 128 N.M. 410, 993 P.2d 727.

Rule 11-801 NMRA provides that an out-of-court statement that is not offered for the truth of the matter asserted does not fall within the definition of hearsay. Consistent with this rule, case law provides that "[e]xtrajudicial statements . . . may properly be received into evidence, not for the truth of the assertions therein contained, or the veracity of the out-of-court declarant, but for such legitimate purposes as that of establishing . . . *effect on the hearer*." *State v. Rosales*, 2004-NMSC-022, ¶ 16, 136 N.M. 25, 94 P.3d 768 (emphasis added) (internal quotation marks and citation omitted). In the present case, the State introduced the statement at issue to explain why Victim's aunt was concerned about Defendant's contact with Victim at the birthday party; why her aunt decided to "keep an eye" on Defendant and Victim; and why her aunt ultimately addressed her concerns with Victim the next evening during "table topic." Because the information in the statement at issue was relevant to explain the aunt's subsequent actions, and why the aunt paid particular

14

attention to Defendant at the party, we hold that it was properly admitted. *See State v. Otto*, 2007-NMSC-012, ¶ 20, 141 N.M. 443, 449, 157 P.3d 8, 15 (holding that the trial court properly admitted the victim's statements to her mother regarding the defendant's unlawful touchings to show why the victim's mother confronted the defendant).

We recognize that "the evidence must be consistent with a legitimate purpose and have some proper probative effect upon an issue in the case." *See State v. Alberts*, 80 N.M. 472, 475, 457 P.2d 991, 994 (Ct. App. 1969); *see also State v. Apodaca*, 118 N.M. 762, 771, 887 P.2d 756, 765 (1994) (providing that out-of-court statements supporting the reasonableness of a detective's conduct may be admissible if relevant to a fact of consequence). In this case, a fact of consequence was whether Defendant was alone with Victim in the master bedroom. As part of his defense, Defendant suggested that the aunt's memory of the bedroom incident, as well as that of the other witnesses, was more the tainted result of a "topic of conversation" between the witnesses, rather than an accurate reflection of what the witnesses actually observed and remembered about the birthday party. Because the out-of-court statement at issue was introduced to show why the aunt paid particular attention to Defendant, thus potentially impacting the credibility of her statements relating her memory of the bedroom incident, we hold that there was no abuse of discretion in

admitting the statement. *See, e.g., State v. Stampley*, 1999-NMSC-027, ¶ 39, 127 N.M. 426, 982 P.2d 477 (holding that the out-of-court statements referred to by the detective on re-direct examination that identified the defendant as the shooter was properly admitted as relevant to the detective's motive for investigating the defendant as a suspect and to rebut the defendant's suggestions of bias and baseless judgments against him).

## V. CONTINUANCE

Defendant argues that the district court erred in denying his motion for continuance based on his desire to "explore [Victim's] mental capabilities." Defendant filed the August 15, 2006, motion for continuance at issue less than a week before the August 21, 2006, scheduled trial date. Defendant's motion provided:

> [W]hile interviewing one of the witnesses, on August 11, 2006, it was discovered that . . . [V]ictim possibly suffers some sort of mental disorder, and is currently taking special education classes at the school at which she is attending. The defense needs to further investigate the possibility that . . . [V]ictim may have a disorder which interferes with her ability to accurately recall the alleged crimes, and to accurately relate her memories as a witness.

Defendant continues this argument on appeal and asserts that the denial of his requested continuance deprived him of the right to a fair trial and to present a defense.

The granting or denial of a continuance is within the sound discretion of the district court, and it is the defendant's burden to establish an abuse of discretion. *See*

*State v. Sanchez*, 120 N.M. 247, 253, 901 P.2d 178, 184 (1995). In exercising its discretion, the district court should consider various factors, including the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion. *See State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20. Particularly relevant to the present case are the *Torres* factors of the fault of the movant in causing the delay, inconvenience to the parties and the court, and the prejudice to the movant in denying the motion.

Relating to Defendant's role in causing the delay, Defendant lived with Victim in the summer of 2002, and therefore had ample opportunity to observe for himself any perceived compromised mental capabilities. In this respect, Victim's mother testified that "[e]verybody knew that [Victim] was in Special [Education]" and that she and Defendant "had talked about her education and I had told him that she was in Special Education." As such, based on his own observations and knowledge, Defendant could have explored a defense relating to Victim's mental capabilities earlier than one week before trial, and was therefore not dependent upon another witness's interview for such information. Similarly, Victim gave a safe house

17

interview shortly after charges were filed, a copy of which Defendant was provided. Thus, long before one week prior to trial, Defendant had an opportunity to observe Victim's mental capabilities as they related to her memory. For these reasons, we hold that any delay that would result from a continuance was attributable to Defendant's inaction, rather than circumstances beyond Defendant's control. *See State v. Salazar*, 2006-NMCA-066, ¶ 26, 139 N.M. 603, 136 P.3d 1013, *cert. quashed*, 2007-NMCERT-004, 141 N.M. 569, 158 P.3d 459 (assessing that the trial court could have determined that it was defense counsel's fault in causing the claimed need for the delay and affirming the denial of the defendant's requested continuance).

Defendant's delay in seeking a continuance also contributed to the inconvenience that a continuance would have caused the district court and the State. Because our Supreme Court had already denied a final request to extend the time for commencing trial under Rule 5-604 NMRA, trial had to commence no later than August 30, 2006. Defendant's last minute request for a continuance filed on August 15, 2006, would have required the district court to quickly reschedule the commencement of trial to begin within a little over one week from the already scheduled date of August 21, 2006, to avoid violating the six-month rule. However, the district court was constrained from doing so because the court already had numerous other matters scheduled to begin on trailing dockets over that same period of time. Even if it had

18

been possible to do so, which the district court believed was impossible, we cannot say the court abused its discretion in denying Defendant's continuance request given the risk that trial could not be reset in time to avoid dismissal under the six-month rule. *See Torres*, 1999-NMSC-010, ¶ 10 (providing that courts should consider the inconvenience to the parties in evaluating a motion for continuance).

As for the *Torres* prejudice factor, we question Defendant's assertion that Victim's mental capabilities might have compromised her ability to accurately recollect events. The record and the trial testimony of Victim's mother indicate that Victim was in special education classes to address dyslexia, a speech problem, and a learning disability, but not for matters affecting her ability to recall events. *See In re Ernesto M.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 (holding that "[a]n assertion of prejudice is not a showing of prejudice"). We note in addition that Defendant was not precluded from pursuing any questions regarding perceived difficulties by Victim in understanding, memory, amenability to suggestion, and the impact of her learning disability by use of cross-examination. *Cf. State v. Hernandez*, 115 N.M. 6, 15, 846 P.2d 312, 321 (1993) (holding that the defendant was not deprived of a potential avenue of defense when defense counsel adequately placed the State's evidence into question through cross-examination).

19

Because Defendant himself was aware of Victim's participation in special education classes and had ample time to explore any defense related to this, because accommodating Defendant's continuance request would have been extremely difficult if not impossible, and because we are not persuaded that Defendant was prejudiced by the denial of his continuance, we hold that the district court did not abuse its discretion in denying his request for a continuance. *See State v. Gonzales*, 112 N.M. 544, 549, 817 P.2d 1186, 1191 (1991) (holding that to show an abuse of discretion in denying a request for continuance, it must appear that the court acted unfairly, arbitrarily, or committed manifest error).

## VI.  MENTAL CAPABILITY

Defendant argues that the district court erred in allowing Victim's mother to testify about Victim's "mental capability."  At issue is her mother's testimony that Victim had been in special education classes, and had a speech problem and a learning disability.  We review the district court's admission of evidence for abuse of discretion. *See State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72.  An abuse of discretion occurs when the evidentiary ruling is against logic, and is clearly untenable or unjustified by reason. *Id.*

To the extent Defendant argues that he was precluded from effective cross-examination, we disagree.  As set forth in our discussion of Issue V, Defendant

himself knew that Victim was in special education classes, and was not precluded from cross-examining Victim or her mother on this point. *See generally State v. Aragon*, 116 N.M. 291, 296, 861 P.2d 972, 977 (Ct. App. 1993) (stating that the right of confrontation consists of the accused's right of cross-examination and "the right of the accused, the court and the jury to observe the deportment and conduct of the witness while testifying") (internal quotation marks and citation omitted).

Moreover, we further disagree that her mother's testimony was improper because it required special expertise and was in part a "medical diagnosis." Her mother's testimony relating Victim's participation in special education classes was about a matter within her own personal knowledge, and did not refer to or depend on any medical records. *See State v. Martinez*, 104 N.M. 584, 587, 725 P.2d 263, 266 (Ct. App. 1986) (holding that "[a] witness having personal knowledge of relevant matters is competent to testify"); *State v. Luna*, 92 N.M. 680, 684, 594 P.2d 340, 344 (Ct. App. 1979) (recognizing that lay witnesses may give opinion testimony concerning their own perceptions where that opinion is helpful to the determination of a fact in issue); *cf.* Rule 11-701 NMRA (preventing lay witnesses from testifying "based on scientific, technical or other specialized knowledge within the scope of [the rule governing testimony by experts]"); *State v. Alberico*, 116 N.M. 156, 166, 861 P.2d 192, 202 (1993) (recognizing that scientific knowledge is what distinguishes

expert opinion testimony from lay opinion testimony, which requires personal observation).

Lastly, we disagree with Defendant's assertion that the prosecutor improperly used Victim's mental state to elicit sympathy. Rather than being an improper attempt to elicit sympathy, the prosecutor's reference to Victim's self-consciousness about her speech impediment and being in special education classes was relevant to show why Defendant may have selected Victim and viewed her to be "an easy mark" and "the perfect victim." Given that some of the acts of CSCM occurred after Defendant read to Victim, her mother's testimony was relevant to demonstrate how Defendant took advantage of Victim's reading difficulties to create the opportunity to sexually assault Victim. *See generally* Rule 11-402 NMRA (providing that relevant evidence is generally admissible).

**CONCLUSION**

Based on the foregoing discussion, we affirm.

**IT IS SO ORDERED.**

_____
**ROBERT E. ROBLES, Judge**

22

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**MICHAEL E. VIGIL, Judge**