10 P.3d 127

2000-NMSC-026

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Shawn JACOBS, Defendant–Appellant.**

No. 24,062.

Supreme Court of New Mexico.

Aug. 16, 2000.

Rehearing Denied Sept. 7, 2000.

**454**

Phyllis H. Subin, Chief Public Defender, Christopher Bulman, Appellate Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Steven S Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.

*OPINION*

FRANCHINI, Justice.

{1} Defendant Shawn Jacobs appeals his conviction and death sentence for the murder of an eighteen-year-old woman. After the guilt phase of a jury trial, Defendant was convicted of first degree murder (willful and deliberate), felony murder (first degree murder), kidnapping (great bodily harm), attempted criminal sexual penetration (second degree), armed robbery, tampering with evidence (two counts), unlawful taking of a motor vehicle, possession of a stolen vehicle, felon in possession of a firearm, escape from jail, and escape from a peace officer. During the sentencing phase of the trial, the jury found the aggravating circumstance of murder in the commission of a kidnapping and imposed the death penalty under the Capital Felony Sentencing Act (CFSA), NMSA 1978

§§ 31–20A–1 to –6 (1979, as amended through 1991). Defendant also was sentenced to a term of imprisonment of sixty-nine years and six months based on the other convictions and on enhanced penalties as an habitual offender and for the use of a firearm. *See* NMSA 1978, § 31–18–17 (1993); NMSA 1978, § 31–18–16 (1977).

{2} On appeal, Defendant claims error occurred in both the guilt and penalty phases of his trial. Regarding the guilt phase of the trial, he asserts that (1) the joinder of the escape charge was improper; (2) the trial court improperly excused potential jurors during voir dire; (3) the trial court improperly admitted evidence; (4) there was insufficient evidence of a kidnapping independent of the attempted criminal sexual penetration; (5) the police officers who conducted the criminal investigation lacked jurisdiction; and (6) he was wrongfully convicted of being a felon in possession of a firearm. For the sentencing phase of the trial, Defendant contests (1) the jury instructions given in the sentencing phase; (2) the sufficiency of the evidence for the aggravating circumstance of murder during the commission of a kidnapping; (3) the introduction of victim impact testimony; and (4) the constitutionality and implementation of the CFSA.

{3} We affirm Defendant's convictions on all counts. However, because of error in the penalty phase of the trial, we reverse and remand for a new sentencing proceeding on the capital penalty charges.

**FACTUAL AND PROCEDURAL BACKGROUND**

{4} On the evening of October 24, 1994, the eighteen-year-old victim was discovered in an arroyo near the Four Hills area of Albuquerque by a man who was riding his bike home from his job at the Sandia Laboratories. He first noticed an abandoned Jeep Cherokee that appeared to be stuck in a ditch. As he traveled farther along the trail, he found a woman's body lying face down alongside the path. She had been shot once in the back of the head and was wearing only her underpants, socks, and shoes. After checking for a pulse and finding none, the

man called the Albuquerque Police Department (APD).

{5} The victim had spent the day with two high-school friends, K.P. and J.G. The three friends had cut their afternoon classes and taken a bus to the Coronado Mall. At the mall, they purchased one black tee shirt with an eight-ball design on the front and the words "Smile Now, Cry Later" on the back; they stole two identical tee shirts so that all three would have the same shirt to wear to school the next day. After they left the mall, they were waiting near a bus stop when Defendant, who was driving a new green Jeep Cherokee, offered them a ride. K.P. and J.G. spoke to Defendant and accepted the offer. K.P. rode in the right front passenger seat and J.G. and the victim rode in the back seat. As he drove them to their homes near the intersection of Indian School and Juan Tabo, Defendant told them about an incident that had occurred when he was a student at Highland High School in which he claimed to have been expelled for pulling a gun on a group of athletes. Defendant dropped off K.P. at her home and J.G. next at hers. He and the victim then drove off; no one saw the victim again until her body was found.

{6} The victim's body was taken to the Office of Medical Examiner (OMI) for an autopsy. At trial, the pathologist who performed the autopsy testified that the cause of death was a contact gunshot wound to the back of the head resulting in an excessive amount of sooty black granular residue on the skin and burning of the hair and skin. He also found evidence of blunt trauma: the victim had been struck near the right eye and inside the right ear with a blunt object and there were skin abrasions between the ear and eye, on her right upper arm and shoulder, her back, and her right knee. The autopsy also revealed the presence of two vaginal tears consistent with forced sexual penetration. Gravel and sand were found in the back of the victim's underpants; no semen was found.

{7} A forensic scientist from the APD Crime Lab testified as an expert witness about the results of the DNA testing he had conducted on the blood and tissue found on the barrel of the black powder handgun seized in the search of Defendant's residence. He had conducted tests using blood samples from four subjects: the victim, Defendant, and two witnesses in the case—a boarder in Defendant's home and a friend of Defendant's. The results excluded three of the four individuals as the source of the blood on the gun barrel; the victim could not be excluded. There was testimony that the probability of another Hispanic individual matching the DNA profile of the victim's blood would be approximately 1 in 2000. A firearms expert from the APD Crime Lab testified that he had conducted tests with the black powder handgun found in Defendant's residence. He determined that the caliber of the projectile recovered from the victim's brain and the markings on it were consistent with having been fired from Defendant's gun.

{8} The jury also heard testimony that the Jeep Cherokee found in the arroyo had been stolen from Quality Jeep Eagle sometime over the weekend before the victim's death on Monday, October 24; Defendant had been seen driving a green Jeep between October 22 and October 24; friends had seen him wearing the black eight-ball tee shirt and the Dallas Cowboy jacket after October 24; Defendant had given to a friend the crucifix and chain which the victim had been wearing on the day of her death; and he offered to sell the black powder handgun in question to a friend.

{9} At the conclusion of the guilt phase of his trial, Defendant was convicted of all charges. In the sentencing phase, the jury found the aggravating circumstances of murder in the commission of a kidnapping, determined that the mitigating circumstances did not outweigh the aggravating circumstances, and sentenced Defendant to death.

## GUILT PHASE ISSUES

### I. Joinder of the Escape Charge.

{10} While awaiting trial on the first degree murder and related charges, Defendant escaped from custody. In response to a medical complaint, Defendant had been taken from the Bernalillo County Detention Center (BCDC) to the emergency room at the Uni-

versity of New Mexico Hospital. While there, Defendant undid the leg cuffs holding him to a hospital bed and fled from the BCDC corrections officer accompanying him. He was subsequently overtaken by the corrections officer, an Albuquerque police officer, and a hospital security officer.

{11} The incident gave rise to an additional indictment charging Defendant with escape from jail under NMSA 1978, § 30–22–8 (1963), or, in the alternative, with escape from a peace officer under NMSA 1978, § 30–22–10 (1963). The State subsequently filed a motion to consolidate the new charges with the original offenses. In its motion, the State argued that the escape attempt would be admissible in the murder trial to show consciousness of guilt and that joinder would promote judicial economy by avoiding two jury trials. Defendant opposed consolidation, arguing that the jury might give the escape evidence improper weight during the penalty phase. After a hearing on the motion, the trial court consolidated the two cases for trial, finding that the escape evidence would be cross-admissible in separate trials, the claim of the possible effect on the jury was speculative, and that any prejudicial effect of the evidence did not substantially outweigh its probative value. *See* Rule 11–403 NMRA 2000. In response to Defendant's concerns, however, the trial court gave a limiting instruction during the sentencing hearing advising the jury not to consider the escape evidence for any purpose during the penalty phase.

{12} Defendant first argues that joinder of the escape charges was improper because it did not meet the criteria for joinder stated in Rule 5–203(A) NMRA 2000. The State argues that this issue was not preserved because at trial Defendant only argued that the jury would misuse the evidence of escape, not that joinder was improper under the rule. We agree that this issue was not preserved. *See* Rule 12–216(A) NMRA 2000. In order to preserve an issue for appeal, it is essential that a party must make a timely objection that specifically apprises the trial court of the claimed error and invokes an intelligent ruling thereon. *State v. Varela,* 1999–NMSC–045, ¶¶ 25–26, 128

N.M. 454, 993 P.2d 1280; *State v. Gomez,* 1997–NMSC–006, ¶ 29, 122 N.M. 777, 932 P.2d 1. This Court held in *State v. Clark,* 108 N.M. 288, 297, 772 P.2d 322, 331 (1989), that, absent fundamental error, even in a death penalty case issues must be properly preserved.

{13} Defendant contends that the escape evidence was prejudicial because the same jury that heard the escape evidence decided whether he should receive the death penalty. The State responds that the jury was given a limiting instruction that it was not to consider Defendant's escape when deliberating on whether to impose the death penalty. Defendant replies that the limiting instruction was insufficient to remove the unfair prejudice and, further, that it conflicted with another jury instruction which instructed the jury that "[i]n deciding the sentence you must consider all the evidence admitted during the trial." *See* UJI 14–7012 NMRA 2000.

{14} On appeal, this Court's review is limited to the question of whether the joinder created "an appreciable risk that the jury convicted for illegitimate reasons." *State v. Duffy,* 1998–NMSC–014, ¶ 42, 126 N.M. 132, 967 P.2d 807. The trial court has broad discretion in resolving the question and will not be reversed on appeal absent a showing of abuse of that discretion. *Id.* To demonstrate error, a defendant must show that his right to a fair trial was prejudiced by the joinder. *Id.*

{15} A defendant might be prejudiced if the joinder of offenses permitted the jury to hear testimony that would have been otherwise inadmissible in separate trials. *See State v. Gallegos,* 109 N.M. 55, 64, 781 P.2d 783, 792 (Ct.App.1989). In this case, however, as Defendant conceded in his pretrial motion and upon appeal, evidence of the escape, even if uncharged, would have been admissible to show consciousness of guilt. This Court has previously recognized the relevance and admissibility of evidence of flight as tending to show a consciousness of guilt. *State v. Trujillo,* 95 N.M. 535, 541, 624 P.2d 44, 50 (1981) (holding admissible evidence of planned flight and an escape from jail); *State v. Smith,* 89 N.M. 777, 783, 558

P.2d 46, 52 (Ct.App.) (holding that evidence of flight, even an aborted plan for flight, tends to show consciousness of guilt), *rev'd on other grounds, Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976). Cross-admissibility of evidence dispels any inference of prejudice from the jury having heard improper evidence. *See State v. Griffin,* 116 N.M. 689, 693, 866 P.2d 1156, 1160 (1993). We conclude that the trial court, having determined properly that the evidence would be cross-admissible in separate trials and having weighed the probative value against the danger of unfair prejudice, did not abuse its discretion in joining the charges.

{16} The escape evidence was properly before the jury during the sentencing phase. *See* § 31–20A–1(C) (allowing all evidence admitted at trial to be considered); *cf. Clark v. Tansy,* 118 N.M. 486, 492, 882 P.2d 527, 533 (1994) (holding future dangerousness appropriate for consideration by capital sentencing juries as long as the defendant is given an opportunity for rebuttal). Since the jury could properly have considered the escape evidence, we need not address the issue of whether the instruction not to consider the evidence of escape impermissibly conflicted with the instruction to consider all evidence admitted during trial.

{17} Defendant also argues for the adoption of a per se reversible error standard in the case of misjoinder. As discussed, we find no misjoinder in this case. Moreover, this Court has previously rejected the adoption of a per se rule requiring reversal. *See State v. Gonzales,* 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992) (declining to adopt a per se rule requiring severance and holding that a defendant must show actual prejudice from joinder of charges). Defendant's arguments do not persuade us to change that position.

## II. Voir Dire of Jury Panel.

{18} During the jury selection process, the trial court conducted individual voir dire. In the course of that process, four potential jurors stated that their religious beliefs would not permit them to impose the death penalty, regardless of the circumstances. They were each excused for cause by the trial court. Defendant asserts that

this was error, claiming that the four prospective jurors were struck because of their religious beliefs and that this exclusion was improper under the United States and New Mexico constitutions. *See* U.S. Const. amends. VI, N.M. Const. art. II, §§ 5, 11, 12, 14, 18; N.M. Const. art. VII, § 3. He claims that his constitutional right to an impartial jury and the constitutional rights of the jurors to serve on a jury were violated.

{19} The decision whether to excuse prospective jurors for cause rests within the sound discretion of the trial court and is reviewed under an abuse of discretion standard. *State v. Hernandez,* 115 N.M. 6, 22, 846 P.2d 312, 328 (1993) (stating that deference is given to the trial court's decision, because that court is in the best position to assess prospective jurors). This Court has previously considered the issue of whether individuals opposed to the death penalty on the basis of their religious beliefs may be excused for cause from capital penalty cases. *State v. Allen,* 2000–NMSC–002, ¶¶ 82–86, 128 N.M. 482, 994 P.2d 728; *State v. Clark,* 1999–NMSC–035, ¶¶ 11–17, 128 N.M. 119, 990 P.2d 793; *State v. Simonson,* 100 N.M. 297, 300, 669 P.2d 1092, 1095 (1983); *State v. Hutchinson,* 99 N.M. 616, 620, 661 P.2d 1315, 1319 (1983). We rejected similar arguments in those cases and are not persuaded by Defendant's argument to change our position.

{20} During voir dire, the four jurors had responded that they could not vote to impose the death penalty regardless of the evidence presented at trial or the trial court's instruction on the law. We conclude that the trial court properly excluded four jurors who could not follow either the jury instructions or their oath; the jurors were not excused on the basis of their religious principles. *See Allen,* 2000–NMSC–002, ¶ 86, 128 N.M. 482, 994 P.2d 728 (holding that trial court did not err in excusing jurors for cause when they would automatically oppose the death penalty); *Clark,* 1999–NMSC–035, ¶ 16, 128 N.M. 119, 990 P.2d 793 (holding that trial court properly removed jurors who could not "view the proceedings impartially and perform their duties in accordance with the juror's oath").

### III. Sufficiency of the Evidence for the Kidnapping Charge.

{21} At trial, Defendant was convicted of kidnapping with great bodily harm under NMSA 1978, § 30–4–1 (1973, prior to 1995 amendment). On appeal, Defendant contends that there was insufficient evidence to support his conviction for kidnapping, arguing that there was no evidence of an intentional abduction separate from that necessarily involved in the attempted criminal sexual penetration and murder.

{22} In reviewing the sufficiency of the evidence in a criminal case, we must determine whether substantial evidence, either direct or circumstantial, exists to support a verdict of guilty beyond a reasonable doubt for every element essential to a conviction. *See State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829. The evidence is reviewed in the light most favorable to the verdict, resolving all conflicts and indulging all permissible inferences to uphold the conviction and disregarding all evidence and inferences to the contrary to ensure that a rational jury could have found each element of the crime established beyond a reasonable doubt. *Id.*

{23} During the guilt phase of the trial, the court instructed the jury on the elements of kidnapping under UJI 14–404 (withdrawn in 1997) in the following manner:

1. The defendant took or restrained or confined [the victim] by force or deception;
2. The defendant intended to hold [the victim] for service against her will;
3. The defendant inflicted great bodily harm on [the victim];
4. This happened in New Mexico on or about the 24 th day of October, 1994.

{24} As the Court of Appeals explained in *State v. Pisio*, 119 N.M. 252, 260, 889 P.2d 860, 868 (Ct.App.1994), the key to finding the restraint element in kidnapping, separate from that involved in criminal sexual penetration, is to determine the point at which the physical association between the defendant and the victim was no longer voluntary. A kidnapping can occur when an association begins voluntarily but the defendant's actual purpose is other than the reason the victim voluntarily associated with the defendant. *Id.* This Court identified distinct and separate conduct in *State v. McGuire*, 110 N.M. 304, 309, 795 P.2d 996, 1001 (1990), when the defendant abducted the victim while stealing her car, raped her, and then later forced her into the woods and murdered her. The Court found that once the defendant had confined the victim with the requisite intent, "he had committed the crime of kidnapping, although the kidnapping continued throughout the course of defendant's other crimes and until the time of the victim's death." *Id.* Under the kidnapping statute in effect at the time, the victim could be confined by force or deception. Section 30–4–1 (1973, prior to 1995 amendment).

{25} In this case, there were several points at which the jury might have found a kidnapping to have occurred. The jury could have found that Defendant kidnapped the victim by deception when he initially offered her a ride home from the mall with another intent in mind. *See McGuire*, 110 N.M. at 308–09, 795 P.2d at 1000–01 (determining that evidence of later sexual assault may be used by jury to infer that defendant had necessary criminal intent at time victim was first restrained); *see also State v. Garcia*, 100 N.M. 120, 124, 666 P.2d 1267, 1271 (Ct.App.1983) (observing that "deception" under the kidnapping statute includes acts that are intended to deceive a victim or omissions that conceal the defendant's purpose). The jury could have found that she was restrained by deception when Defendant changed the intended destination of the ride from her home to the remote location in the Four Hills area of Albuquerque. *See State v. Laguna*, 1999–NMCA–152, ¶ 13, 128 N.M. 345, 992 P.2d 896 (determining that deception occurred when defendant offered ride to victim, concealing intent of making sexual advances toward child), *cert. denied*, No. 26,017 (1999). The jury could also have determined that a kidnapping occurred when the victim made the final walk of 100 yards from the car to her death in the arroyo. *See McGuire*, 110 N.M. at 309, 795 P.2d at 1001 (kidnapping occurred during the course of the defendant's other crimes and

continued until the victim's death). On the facts in this record, we hold that the crime of kidnapping was complete before either the act of attempted criminal sexual penetration or the act of murder began. *See State v. Foster*, 1999–NMSC–007, ¶¶ 33–34, 126 N.M. 646, 974 P.2d 140 (holding that conduct for kidnapping and murder was distinct when the crime of aggravated kidnapping was completed before the act of murder).

{26} We do not agree with Defendant's assertion that the restraint used to kidnap the victim was necessarily the same as that used for the attempted criminal sexual penetration and the murder; Defendant's claim does not present a reasonable view of the evidence. Applying the kidnapping statute in effect to the facts of this case, we determine that there was considerable evidence presented from which the jury could conclude that Defendant took the victim with the intent of holding her for service against her will and then killed her. A rational jury could also have found that the kidnapping, attempted criminal sexual penetration, and the murder were separate acts constituting separate crimes. We conclude that there was sufficient evidence of an independent factual basis for each guilty verdict on the charges of kidnapping, attempted criminal sexual penetration, and murder. Defendant does not contest the sufficiency of the evidence for the murder or attempted criminal sexual penetration charges.

## IV. Eyewitness Identification of Defendant.

{27} Defendant argues that the trial court erred when it denied his pretrial motion to suppress both the out-of-court and in-court identifications of the two eyewitnesses. The witnesses were the two friends, J.G. and K.P., who had been with the victim on the day of her death. Defendant appears to argue that their in-court identifications of him were tainted by their having seen a photograph of him on television. He asserts that the denial of the motion to suppress violated his right to due process.

{28} On October 26, 1994, the day after the victim's body was found, J.G. and K.P. met with a police artist to develop a composite sketch of the man who had given three of them a ride from the mall. In describing Defendant to the artist, both witnesses noted his distinctive ears which they described as being unusually large and folded over. The sketch was then distributed to the media and others to develop leads to the man's identity. In response, an employee of the state penitentiary called to identify the man in the sketch as Shawn Jacobs, an inmate who had been released from prison on October 21, 1994, and gave the police Defendant's address. Additionally, on October 27, 28, and 31, each witness was individually shown three photo arrays. Neither witness could positively identify Defendant from the photo arrays, but one did note at the time that one photograph in the second array resembled the person who had given them the ride. The photograph she singled out was one of Defendant taken in 1992.

{29} On the evening of October 31, the two friends were at the home of K.P.'s grandfather watching the evening news when a photograph of Defendant's face was shown. Both women began screaming the moment they saw the photograph and continued until K.P.'s mother told them to be quiet so that they could hear what was being said on the television. J.G. and K.P. explained that the man in the photograph was the man who had given them a ride on October 24. K.P. called the police to identify the televised photograph as being that of Defendant.

{30} In reviewing the admissibility of an out-of-court photographic identification, we determine whether the procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and whether, under the totality of the circumstances, the identification was still reliable. *State v. Stampley*, 1999–NMSC–027, ¶ 14, 127 N.M. 426, 982 P.2d 477. The relevant factors to be considered in reviewing the totality of the circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention at the time of the crime, the accuracy of the witness's earlier descriptions of the criminal, the certainty of the witness about the identification, and the time elapsed between the

crime and the identification confrontation. *State v. Cheadle,* 101 N.M. 282, 284, 681 P.2d 708, 710 (1983) (relying upon *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). In determining whether there has been a violation of due process in the conduct of a confrontation, we look to the totality of the circumstances. *State v. Torres,* 81 N.M. 521, 525, 469 P.2d 166, 170 (Ct.App.1970). An in-court identification which is independent of, and not tainted by, the out-of-court identification is admissible. *Id.*

{31} Both witnesses testified at the suppression hearing and at trial that they immediately recognized the televised photograph as being that of the man who had given them a ride from the mall and began screaming in response to seeing him. They each testified that they could not hear what was being said on the broadcast because of their screaming. They also were positive in their in-court identifications of Defendant at trial. Previously J.G. had identified Defendant at the preliminary and suppression hearings and had testified that her identification was based on recognizing him and not because she had seen the photograph on television. Based on the record before us, the trial court could properly have determined that the chance viewing of Defendant's photograph on television was not so impermissibly suggestive as to have tainted the witnesses' later in-court identifications. *See Cheadle,* 101 N.M. at 284–86, 681 P.2d at 710–12 (holding that identification procedure was not impermissibly suggestive even though the witnesses had seen the defendant on television before making out-of-court and in-court identifications).

{32} In addition, a review of the totality of the circumstances supports the reliability of the eyewitness identification. The three women encountered Defendant shortly after 5:00 p.m. when it was still daylight. Both eyewitnesses spoke to him before accepting the ride and noticed the kind of car he was driving. The ride from the mall to the women's homes took about fifteen minutes, during which time both women had ample time to talk to him and to observe what he looked like and what he was wearing. During the ride from the mall, they had commented among themselves about Defendant's ears. The composite sketch prepared by the police artist was accurate enough for an employee of the state penitentiary to identify correctly the man in the sketch as Defendant. The witnesses readily identified Defendant from a current photograph when they saw it on the television broadcast just seven days after their encounter with him. Neither witness displayed any doubt in their in-court identifications. Although the eyewitnesses were initially unable to identify Defendant from any of the photo arrays, they did note in their testimony that his appearance was different in the earlier photographs because he then had a mustache, beard, and longer hair, and his ears did not show in those photographs. They also testified that they had wanted to be certain before singling out any one photograph.

## V. Search of Defendant's Residence.

{33} Defendant argues that the trial court erred in denying his pretrial motion to suppress physical evidence taken from his father's house under a search warrant, in particular the Dallas Cowboys jacket belonging to the victim. The following items were named in the warrant and were among the items seized during the search: a Cowboys jacket, a black tee shirt with an eight-ball on the front and the words "Smile Now, Cry Later" on the back, a business card from Quality Jeep Eagle, and a black powder handgun found under the mattress of a waterbed. He asserts that this evidence should have been suppressed because some items were seen by the officers earlier in the evening when they arrested Defendant. He appears to argue that the initial police entry into the house to conduct a protective sweep was illegal and that the officers first spotted the jacket during that entry.

{34} The trial court's denial of a motion to suppress will not be disturbed on appeal if it is supported by substantial evidence, unless it appears that the determination was incorrectly premised. *State v. Boeglin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983). On appeal, we determine whether the law was correctly applied

to the facts, reviewing the evidence in the light most favorable to support the decision reached below, and resolving all conflicts and indulging all inferences in support of that decision. *Id.*

{35} "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). It is constitutional if the officers had "a reasonable belief based on specific and articulable facts" that the area to be swept contains an individual who poses a danger to those on the arrest scene. *State v. Valdez,* 111 N.M. 438, 440, 806 P.2d 578, 580 (Ct.App.1990). Because it is intended to protect the safety of officers and others, the sweep is a quick and limited search, targeted to those areas where a person could reasonably be found. *Buie,* 494 U.S. at 334–35, 110 S.Ct. 1093 (stating that arresting officers may "take reasonable steps to ensure their safety after, and while making, the arrest").

{36} The suppression issue was briefed by both parties, and, after a suppression hearing, the trial court determined that the evidence was admissible. At the hearing, the case agent testified that Defendant had been under surveillance for several days after the police received information about his identity and address from the Department of Corrections employee who had seen the composite sketch. On October 31, 1994, the surveillance team arrested Defendant as he drove away from the house. After his arrest Defendant asked if his car could be driven back to the house; the arresting officers agreed to this arrangement. When the officers arrived at the house, they asked Defendant if anyone was in the house and he responded that no one else was there. One of the officers said that he thought someone was in the house because earlier in the day he had seen a man enter the house and had not seen him leave. They decided, as a matter of officer safety, not simply to rely upon Defendant's assurance and conducted a protective sweep of the house.

{37} The officers testified that they conducted the protective sweep following standard operating procedures. One officer stayed with Defendant in the living room while the other checked the rest of the house to make sure no one was there. Both officers testified that they saw the Cowboys jacket on the floor of the living room, but neither touched it. Having determined that the house was empty, the officers waited outside to ensure no one entered; they knew that a search warrant was being obtained and therefore needed to secure the house. Defendant was taken to the police station.

{38} Defendant asserts that there were no facts suggesting the need for a protective sweep. We disagree. The officers saw another person enter the house while it was under surveillance. The officers also testified that Defendant had told them that his father was a hunter and that there were guns and other weapons inside. As the officers testified, they had no way of knowing who was in the house or what weapons might be there. Additionally, the officers knew that they were investigating a violent crime in which a gun had been used. The police officers had a reasonable belief that an immediate security sweep of the premises was required for their own safety. For these reasons, we hold that the officers were justified in conducting a protective sweep of the house.

{39} Defendant's claim about the jacket is also without merit. The officers testified during the suppression hearing and at trial that they had already seen Defendant wearing the Cowboys jacket during their surveillance. The officers had noticed the jacket because it was similar to the description given by the victim's mother of what her daughter had been wearing the day she disappeared. The case agent, who prepared the search warrant, stated that the information about Defendant walking out of his house wearing a Dallas Cowboys jacket was already noted in the search warrant affidavit before the officers conducted the protective sweep.

{40} Defendant also argues that the officers conducting the search of his father's house grossly exceeded the scope of the search warrant by taking two items not specified in the warrant: a photograph album and

a bottle of chloroform. He argues that the officers' actions turned the search warrant into an impermissible general warrant, thereby violating the Fourth Amendment and requiring blanket suppression of all the evidence. In making this argument Defendant relies upon *United States v. Foster,* 100 F.3d 846, 849–50 (10th Cir.1996).

{41} The Tenth Circuit Court of Appeals, in assessing similar allegations of searches exceeding the scope of a search warrant, has articulated a general rule that if evidence has been illegally seized, "only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant." *United States v. Le,* 173 F.3d 1258, 1269 (10th Cir.1999). A search is generally not invalidated because some items not listed in a search warrant are seized, particularly if these items are not admitted into evidence against a defendant. *Id.* In very rare cases, the Court observed, the unusual remedy of blanket suppression of evidence was applied when there has been a flagrant disregard for the terms of the warrant or when the searches have been predicated on subterfuge. *Id.* at 1269–70; *see also Foster,* 100 F.3d at 852 (upholding the district court's finding that the officers obtained the search warrant with an intent to seize anything of value rather than to adhere to specific terms of warrant); *United States v. Medlin,* 842 F.2d 1194, 1197–99 (10th Cir.1988) (finding that the basis for obtaining the warrant and conducting the search was pretextual). The Tenth Circuit has also determined that "when a logical nexus exists between seized but unnamed items and those items listed in the warrant, the unnamed items are admissible." *United States v. Gentry,* 642 F.2d 385, 387 (10th Cir.1981) (holding that laboratory equipment, although not specified in search warrant, bore a reasonable relationship to the methamphetamine sulfate which was the object of the search and therefore was admissible); *see also United States v. Snow,* 919 F.2d 1458, 1461 (10th Cir.1990) (holding that the defendant's personal financial statement bore a reasonable relationship to the defendant's real estate scheme and was admissible).

{42} Defendant raised the issue of exceeding the scope of the warrant in his pretrial motion to suppress. Although the subsequent suppression hearing afforded Defendant an opportunity to resolve his challenges to the scope of the search, he did not present any evidence on these two items at that hearing. The motion to suppress was denied. A review of the record indicates that the photograph album was introduced into evidence at trial without objection. The officer who collected the Cowboys jacket for evidence during the search of the house testified that he found the album in the front pocket of that jacket. The record does not indicate that the chloroform was introduced into evidence, and Defendant makes no claim that it was.

{43} Under these circumstances, we conclude that the search of the house did not grossly exceed the scope of the warrant. The officers were lawfully on the premises under a warrant issued as part of an investigation of the murder of a young woman. Having discovered the photograph album in the pocket of the victim's jacket, it was reasonable for the officers to conclude that the item was related to the crime being investigated. As for the other item, the bottle of chloroform, even if it arguably may have been improperly seized, the officers' conduct did not exhibit a flagrant disregard for the terms of the warrant. If there had been a finding of an improper seizure, the appropriate remedy in this case would have been suppression of the chloroform. *See Le,* 173 F.3d at 1271; *see also State v. Patscheck,* 2000–NMCA–062, ¶ 15, 129 N.M. 296, ¶ 15, 6 P.3d 498, ¶ 15. Nevertheless, because the chloroform was never introduced into evidence, Defendant's arguments are moot. *See Le* at 1272 (determining that defendant's suppression argument was moot because he was never prosecuted for possession of any of the seized items).

## VI. Testimony of the Victim's Mother.

{44} The victim's mother was a witness during the trial. She testified about her daughter's disappearance and identified the victim's personal belongings that had been found by her body, the Cowboys jacket found

in Defendant's house which had been a birthday gift from the mother, and the gold crucifix and chain Defendant had given to a friend of his. At the beginning of the mother's trial testimony, the district attorney elicited general background information from the mother by asking where she lived, how many children she had, and the ages of the children. Defendant characterizes this testimony as victim impact evidence and claims to have been prejudiced by its improper introduction during the guilt phase of the trial.

{45} The admission of evidence is entrusted to the discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion and that an error in the admission of evidence was prejudicial. *See State v. Jett*, 111 N.M. 309, 312, 805 P.2d 78, 81 (1991). As the trial court observed when it admitted the testimony, some background of any witness is appropriate and provides an initial basis for assessing credibility. *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 401.04[4][a], at 401–38 (Joseph M. McLaughlin, ed., 2d ed.2000) (describing background evidence as tied to issues of credibility and as telling the jury something about the witness as a person); *cf. Clark*, 108 N.M. at 299, 772 P.2d at 333 (finding that brief description of background information by victim's mother was not victim impact testimony during period when victim impact evidence was not admissible). This kind of testimony by the victim's mother was not victim impact evidence. There has been *no* showing of abuse of discretion or of prejudice to Defendant. We conclude that the trial court acted properly.

## VII. Testimony about Defendant's Escape.

{46} Defendant also asserts that the testimony of the Albuquerque police officer who helped to block Defendant's escape attempt from the hospital was prejudicial. The officer related Defendant's admissions about picking the lock on the cuffs on his legs with a paper clip and then, in response to a question by the district attorney, the officer said that he had been unable to pick the lock with a paper clip. No objection was made to the

testimony at trial. *See* Rule 12–216(A) (requiring that a ruling on a question must have been invoked from the district court for a question to be preserved for appellate review). Additionally, Defendant has not demonstrated how he was prejudiced by testimony. Defendant's assertion of the possibility of prejudice, without more, is insufficient to establish actual prejudice. *See In re Ernesto M.*, 1996–NMCA–039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

## VIII. Additional Claims of Error.

{47} Defendant raises two claims of error under *State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967) (advising appellate counsel to advance a defendant's arguments even if their merits are questionable) and *State v. Boyer*, 103 N.M. 655, 659, 712 P.2d 1, 5 (Ct.App.1985) (recognizing that an attorney should present a client's contentions even if counsel has no faith in them). The first claim is that the police officers who conducted the investigation of the crimes lacked jurisdiction. In the second claim he contends that he was improperly convicted under New Mexico law of being a felon in possession of a firearm. We have considered Defendant's arguments on both issues, but they are without merit and we do not discuss them.

## IX. Ineffective Assistance of Trial Counsel.

{48} On appeal, Defendant raises several claims of error by trial counsel which he asserts denied him effective assistance of counsel. Counsel is presumed competent unless a defendant succeeds in showing both the incompetence of his attorney and the prejudice resulting from the incompetence. *Gonzales*, 113 N.M. at 229–230, 824 P.2d at 1031–1032. In making a claim of ineffective assistance of counsel, a defendant must establish that his attorney did not exercise the skill of a reasonably competent attorney. *Jett*, 111 N.M. at 315, 805 P.2d at 84. He must also show the prejudice he suffered as a result of the alleged incompetence. *Id.* The prejudice must be of sufficient magnitude to call into question the reliability of the trial results. *Duncan v. Kerby*, 115 N.M. 344,

348, 851 P.2d 466, 470 (1993). To determine whether there was prejudice, a reviewing court must consider the totality of evidence presented. *State v. Price*, 104 N.M. 703, 709, 726 P.2d 857, 863 (Ct.App.1986).

{49} Defendant complains of trial counsel's failure to object to the excusal for cause of potential jurors who opposed the death penalty and his failure to object to part of a witness's testimony about the escape. A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct. *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct.App. 1992). A reviewing court will not attempt to second guess that decision. *State v. Hester*, 1999–NMSC–020, ¶ 11, 127 N.M. 218, 979 P.2d 729. An attorney's decision to object to testimony or other evidence is a matter of trial tactics. Moreover, the issue of excusing potential jurors who cannot fulfill their lawful duties because of their opposition to the death penalty has been resolved by this Court adversely to Defendant's position. Trial counsel had raised the issue in pretrial motions; his argument was rejected by the trial court. As a matter of strategy, counsel may have decided not to advance once again a challenge that has never been sustained by this Court. *See State v. Martinez*, 1996–NMCA–109, ¶ 27, 122 N.M. 476, 927 P.2d 31 (holding that "[f]ailure to renew at trial a motion concerning an evidentiary matter which has been denied in limine does not constitute ineffective assistance of counsel").

{50} Defendant's contention that his trial counsel failed to make certain arguments in opposition to victim impact testimony is misplaced. A review of the record shows that during pretrial motions and at trial, defense counsel relied upon both the federal and New Mexico constitutions and United States Supreme Court case law in opposing the introduction of that testimony. We need not address Defendant's contentions about the jury instructions for aggravating circumstances given during the penalty phase of the trial, because we address that argument on the merits.

{51} Defendant has failed to show that trial counsel was ineffective in defending him. The trial judge, in fact, commented twice upon the professional manner shown by both the counsel for the State and Defendant during the course of the pretrial motions, hearings, and trial. Furthermore, Defendant has offered no evidence to show prejudice—that but for counsel's alleged deficiencies, there was a reasonable probability that the outcome of the trial would have been different. *State v. Baca*, 1997–NMSC–045, ¶¶ 20–21, 124 N.M. 55, 946 P.2d 1066; *accord Williams v. Taylor*, 529 U.S. 362, ——, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000) (reaffirming that the test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is to be used for resolving virtually all claims of ineffective assistance of counsel). As the State argues, the evidence against Defendant was overwhelming. Failure to prove either prong of the test defeats a claim of ineffective assistance of counsel. *Baca*, 1997–NMSC–045, ¶ 21, 124 N.M. 55, 946 P.2d 1066. Defendant has proved neither part of the test; his claims, therefore, are rejected.

## X. Cumulative Error.

{52} Defendant's final argument about the guilt phase of the trial is that the claimed errors of the trial court had the cumulative effect of depriving him of a fair trial. The principle of cumulative error requires reversal when the cumulative effect of errors occurring during trial was "so prejudicial that the defendant was deprived of a fair trial." *State v. Baca*, 120 N.M. 383, 392, 902 P.2d 65, 74 (1995). This principle is to be strictly applied. *State v. Woodward*, 121 N.M. 1, 12, 908 P.2d 231, 242 (1995). After reviewing the record of the guilt phase of the trial and finding no error, we conclude that Defendant received a fair trial The judgment of the trial court regarding Defendant's guilt is affirmed.

## PENALTY PHASE ISSUES

{53} Upon appeal, this Court reviews a sentence of death sentence to determine the validity of that sentence under Section 31–20A–4(C) of the CFSA. A sentence may be invalid if:

(1) the evidence does not support the finding of a statutory aggravating circumstance;

(2) the evidence supports a finding that the mitigating circumstances outweigh the aggravating circumstances;

(3) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; or

(4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Section 31–20A–4(C).

## XI. Aggravating Circumstances.

{54} Upon conviction in a capital felony case, the trial court conducts a sentencing hearing before the same jury to determine whether the penalty should be life imprisonment or the death sentence. Section 31–20A–1(B). Before the death penalty can be imposed, a unanimous jury must have found beyond a reasonable doubt at least one of the statutory aggravating circumstances listed in Section 31–20A–5. *See* § 31–20A–3; *see also State v. Compton*, 104 N.M. 683, 693, 726 P.2d 837, 847 (1986) (describing aggravating circumstances as defining the circumstances under which the legislature considers the death penalty warranted).

{55} In this case, the jury was given a separate instruction for each of two aggravating circumstances: the aggravating circumstances of murder committed during the commission or attempted commission of criminal sexual penetration, and/or of murder committed during the commission of or attempted commission of kidnapping. *See* § 31–20A–5(B). The jury found unanimously, beyond a reasonable doubt, the aggravating circumstance of murder during the commission of a kidnapping and was unable to agree on the aggravating circumstance of murder during the commission or attempted commission of criminal sexual penetration.

{56} Defendant asserts that there was insufficient evidence to support the jury's finding of the aggravating circumstance of murder during the commission of a kidnapping. *See* § 31–20A–5(B). "In as-

sessing the sufficiency of the evidence used to support the death penalty, we must apply a degree of scrutiny that reflects 'the qualitative difference of death from all other punishments.'" *Allen*, 2000–NMSC–002, ¶ 61, 128 N.M. 482, 994 P.2d 728 (quoting *California v. Ramos*, 463 U.S. 992, 998, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)). In support of his argument, Defendant relies upon *State v. Henderson*, 109 N.M. 655, 661, 789 P.2d 603, 609 (1990) *overruled in part on other grounds by Clark v. Tansy*, 118 N.M. at 493, 882 P.2d at 534, in which this Court found insufficient evidence to support the aggravating circumstance of murder in the commission of a kidnapping. Under the facts of *Henderson*, in which the rape and kidnapping appeared to have occurred simultaneously, the Court held that the evidence did not support a finding that the murder of the victim was committed in the commission of a kidnapping. *Id.* Upon remand, double jeopardy barred the submission of this aggravating circumstance to the jury. *Id.* at 663, 789 P.2d at 611.

{57} In arriving at that conclusion, the opinion distinguished *Henderson* from *State v. Guzman*, 100 N.M. 756, 676 P.2d 1321 (1984), a case in which the jury had found three separate aggravating circumstances. *Henderson*, 109 N.M. at 661, 789 P.2d at 609. The facts of this case, however, more closely resemble those of *Guzman*, in which a separate and distinct kidnapping took place before the murder occurred. *See Guzman*, 100 N.M. at 759, 676 P.2d at 1324. In this case, evidence was presented that Defendant initiated the kidnapping well before and separately from the commission of the other felonies although the kidnapping continued until the time of the victim's death. *See Allen*, 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728; *McGuire*, 110 N.M. at 309, 795 P.2d at 1001. Based on the facts of this case, there was sufficient evidence for the jury to have found beyond a reasonable doubt that the victim was murdered during the commission of a kidnapping.

{58} Defendant also argues that the jury instructions for the aggravating circumstance of murder in the commission or attempted commission of a kidnapping were

in error because they did not require the jury to find a separate and distinct kidnapping apart from the attempted criminal sexual penetration and the murder. His claim of error is based on the assertion that there was inadequate evidence of an independent kidnapping. Because no objection to the alleged error was raised to the trial court, Defendant bases his claim on the principle of fundamental error. *See* Rule 12–216(B) NMRA 2000. This principle is applied to prevent a miscarriage of justice. *State v. Osborne,* 111 N.M. 654, 662, 808 P.2d 624, 632 (1991). To establish fundamental error, there must be a showing that error was of such magnitude that it affected the trial outcome, so that the issue of the defendant's guilt has become "so doubtful that it would shock the judicial conscience to allow the conviction to stand." *Baca,* 1997–NMSC–045, ¶ 41, 124 N.M. 55, 946 P.2d 1066. Defendant has not made this showing.

{59} Furthermore, we find no error in the jury instruction. For the aggravating circumstance of murder during the commission of a kidnapping, the jury was instructed that they must find that (1) the crime of kidnapping was committed, (2) the victim was murdered while Defendant was committing the kidnapping, and (3) the murder was committed with the intent to kill. *See* UJI 14–7015 NMRA 2000. The standard instruction contained all the elements necessary to establish the aggravating circumstance of the murder in the commission of a kidnapping and the evidence established the occurrence of a separate and distinct kidnapping. Defendant does not challenge the jury's determination that the murder was committed with the intent to kill. *Cf. Allen,* 2000–NMSC–002, ¶ 75, 128 N.M. 482, 994 P.2d 728.

{60} Finally, Defendant also asserts that the jury instructions were flawed because they presented two separate aggravating circumstances. His claim is that Section 31–20A–5(B) should be read to permit only one crime to be chosen from among the three aggravating circumstances contained in that section. The identical contention was resolved against Defendant in *Guzman,* 100 N.M. at 761, 676 P.2d at 1326, in which the Court decided that "when the Legislature used the conjunction 'or', they intended that *either* of the crimes could be used as an aggravating circumstance, the basis from which the death penalty can be imposed." Agreeing with that interpretation of the statute, we find no error in the jury instructions. When the evidence shows that more than one aggravating circumstance exists under Section 31–20A–5(B), any and all of the listed crimes may be considered as separate aggravating circumstances. The use of multiple instructions in these circumstances was proper.

## XII. Aggravating and Mitigating Circumstances.

{61} Under the CFSA, a defendant may present mitigating evidence to the jury during the sentencing phase of a capital trial to show why the death penalty should not be imposed. Sections 31–20A–2; 31–20A–6. The CFSA requires a jury to weigh the aggravating and mitigating circumstances against each other to determine whether a life or death sentence is appropriate. Section 31–20A–2(B). In this case, after weighing the aggravating and mitigating circumstances and considering both Defendant and the crime, the jury determined unanimously that Defendant should be sentenced to death.

{62} On appeal, this Court is required to review the aggravating and mitigating circumstances to determine whether the evidence would support a finding that the mitigating circumstances were sufficient to outweigh the aggravating circumstances. Section 31–20A–4(C)(2); *Allen,* 2000–NMSC–002, ¶ 81, 128 N.M. 482, 994 P.2d 728. However, because the death sentence has been vacated and this case is being remanded for a new sentencing hearing, we need not address this question. *See State v. Finnell,* 101 N.M. 732, 736, 688 P.2d 769, 773 (1984).

## XIII. Influence of Arbitrary Factors.

{63} In the third statutory inquiry under Section 31–20A–4(C)(3), this Court reviews the decision of the jury to impose the death sentence to determine if the sentence was imposed under the influence of any arbitrary factors. Defendant asserts that the admission of victim impact testimony during the

penalty phase of the trial was improper under the state and federal constitutions and New Mexico statutes. We disagree.

{64} The issue of victim impact evidence in New Mexico has been considered by this Court in two recent opinions, both of which held that " 'victim impact evidence, brief and narrowly presented, is admissible during the penalty phase of death penalty cases.' " *Allen*, 2000–NMSC–002, ¶ 52, 128 N.M. 482, 994 P.2d 728 (quoting *Clark*, 1999–NMSC–035, ¶ 37, 128 N.M. 119, 990 P.2d 793). In *Clark*, the Court relied upon *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that the Eighth Amendment does not preclude the use of victim impact evidence in the penalty phase of a capital trial. 1999–NMSC–035, ¶ 37, 128 N.M. 119, 990 P.2d 793. Further, the Court determined that victim impact testimony was consistent with the New Mexico Constitution and that the legislature had provided statutory authority for the introduction of victim impact testimony. *Id.* ¶¶ 42–45. In *Allen*, a majority of the Court found constitutional and statutory authority for the introduction of victim impact testimony. *Allen*, 2000–NMSC–002, ¶ 53, 128 N.M. 482, 994 P.2d 728. The opinion also observed that the rules of evidence governing relevance and the weighing of unfair prejudice against probative value apply to the introduction of victim impact evidence during the penalty phase of death penalty cases. *Id.* ¶ 54 (citing Rules 11–402 NMRA 2000, 11–403).

{65} During the penalty phase of this trial, the prosecutor presented victim impact evidence from two witnesses, the victim's mother and the mother's cousin. The mother testified about her relationship with her daughter and the effect the death had upon her and upon the victim's brother and sister. The cousin testified that the mother worked for her and that she had seen the mother's struggle with the aftermath of her daughter's death. She also testified about the help and support she and the other co-workers had offered to the mother during the two years since the victim's death.

{66} At the conclusion of these statements, however, the prosecutor questioned each of the witnesses about an episode that had occurred while Defendant was awaiting trial. Although Defendant was in custody, he managed to send several magazine subscriptions in the victim's name to her mother's address, so it appeared that her daughter was receiving mail. He also sent one subscription to the mother as though it were a gift from her daughter. The district attorney and Defendant stipulated that the handwriting on the subscription order cards was that of Defendant. The victim's mother testified about receiving the subscriptions, the gift subscription, and the subsequent bills for those items at Defendant's sentencing hearing. She also related how distressing it had been to receive magazines addressed to her daughter and how devastated she was when she learned that Defendant was responsible. The mother's cousin also testified about the impact of the magazine subscriptions upon the mother as follows: "She just couldn't believe somebody would be that cruel to her .... and when she found out that they were coming from Shawn Jacobs, she said, " 'Why does he keep hurting my family? .... Why does he keep hurting me?" In closing argument, the State commented upon Defendant's love of cruelty in tormenting the victim's mother.

{67} We conclude that the mother's initial testimony about the effect of the murder on her and her family was relevant and admissible at the penalty phase of the trial. *See Payne*, 501 U.S. at 825–26, 111 S.Ct. 2597 (permitting the introduction of victim impact evidence to allow the jury to understand the consequences of the crime committed); *see also Allen*, 2000–NMSC–002, ¶ 52, 128 N.M. 482, 994 P.2d 728; *Clark*, 1999–NMSC–035, ¶ 37, 128 N.M. 119, 990 P.2d 793. Nevertheless, the testimony about the magazine subscriptions should not have been admitted during the State's case-in-chief as victim impact evidence, because the evidence goes beyond the scope of what is admissible under *Payne*, *Clark*, or the CFSA as victim impact evidence. *Payne* held that victim impact evidence was admissible as a "method of informing the sentencing authority about the specific harm caused by the crime in question." 501 U.S. at 825, 111 S.Ct. 2597. Although the magazine subscription testimony did describe harm caused by

Defendant, this harm was not caused by the crimes in question. In *Clark*, we held that victim impact evidence was admissible because it constituted additional evidence as to the circumstances of the crime. 1999–NMSC–035, ¶ 38, 128 N.M. 119, 990 P.2d 793. In this case, the testimony about the magazine subscriptions by both witnesses was not relevant to the crimes for which Defendant was standing trial; it fell outside the scope of "circumstances of the crime." *See* § 31–20A–1(C); Rule 11–402 NMRA 2000 (evidence which is not relevant is not admissible). The State argues that this evidence was admissible under Section 31–20A–2(B) which directs the jury to consider both "the defendant and the crime" in determining whether to sentence a defendant to death or life in prison. However, we do not read Section 31–20A–2(B) to address the scope of evidence that can be heard by the jury, but rather to provide guidance on how to weigh the evidence permitted under Section 31–20A–1(C). Section 31–20A–2(B) may not be used to permit the introduction of otherwise inadmissible evidence.

{68} The State also argues that the subscription evidence is probative of Defendant's lack of remorse. In *Allen*, 2000–NMSC–002, ¶ 108, 128 N.M. 482, 994 P.2d 728, we upheld the state's closing argument in which the prosecutor had argued that the defendant was not remorseful. We construed the argument to have been offered in rebuttal to the defendant's statement at sentencing in which he had expressed remorse for the killing. *Id.* In this case, however, Defendant made no such claim. In fact, the trial court had granted a motion in limine prohibiting evidence that went to lack of remorse during the penalty phase unless Defendant had opened the door. At the point at which the subscription evidence was introduced, Defendant had offered no evidence. Under the circumstances of this case, evidence concerning Defendant's alleged lack of remorse was not admissible.

{69} As we have noted, in New Mexico the death penalty may not be imposed if the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 31–20A–4(C)(3).

This evidence created a possibility that the jury voted for the death penalty under the influence of an improper factor. As the Supreme Court has stated, "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Because we cannot say that this evidence did not bear on any juror's decision to sentence Defendant to death, we therefore reverse on this issue and remand for a new sentencing hearing.

## XIV. Proportionality Review.

{70} This Court reviews a death sentence in order to determine if it is disproportionate to sentences imposed in similar cases using the guidelines established in *State v. Garcia*, 99 N.M. 771, 780, 664 P.2d 969, 978 (1983). *See* § 31–20A–4(C)(4). Defendant asserts that those guidelines are flawed. With an order for a new sentencing hearing, a proportionality review of Defendant's sentence is not called for. *Cf. Clark v. Tansy*, 118 N.M. at 494, 882 P.2d at 535 (determining that when death sentence is vacated, a proportionality review must wait until the event that the death penalty is imposed on remand). *State v. Wyrostek*, 117 N.M. 514, 523, 873 P.2d 260, 269 (1994) (holding that a review of *Garcia* guidelines would be an advisory opinion in absence of actual death sentence).

## XV. Constitutionality of the CFSA.

{71} Defendant contends that the Capital Felony Sentencing Act is unconstitutional, arguing that (1) it fails to give juries proper guidance or to require specific jury findings thus precluding adequate appellate review; (2) the statutory mitigating circumstance regarding prior criminal activity is unconstitutionally vague; and (3) the mitigating circumstance that considers a defendant's cooperation with authorities violates the constitutional rights to remain silent, to counsel, to a fair trial, and to due process. *See* §§ 31–20A–6(A), (H). Finally, he asserts that the death penalty constitutes cruel and unusual punishment.

U.S. Const. amends. XIII, XIV; N.M. Const. art. II, §§ 13, 18.

{72} This Court has addressed these arguments in previous cases and held previously that the CFSA is constitutional. Defendant's assertions do not convince us to reconsider our earlier decisions. Defendant's first claim was dealt with in *Clark*, 1999–NMSC–035, ¶ 67, 128 N.M. 119, 990 P.2d 793 (rejecting defendant's assertion that the CFSA did not provide adequate standards for review); *Clark*, 108 N.M. at 307, 772 P.2d at 341 (holding that specific legal standards for weighing aggravating circumstances against mitigating circumstances are not constitutionally required in a capital sentencing procedure); and *Finnell*, 101 N.M. at 736, 688 P.2d at 773 (holding that capital jury does not have to find beyond a reasonable doubt that the death penalty is the appropriate sentence). The contentions regarding the statutory mitigating circumstances were addressed in *Clark*, 1999–NMSC–035, ¶ 69, 128 N.M. 119, 990 P.2d 793 (holding that Section 31–20A–6(H) did not punish a defendant for exercising his constitutional rights to remain silent, to counsel, to a fair trial, and to due process); *Compton*, 104 N.M. at 692, 726 P.2d at 846 (holding that Section 31–20A–6(H) did not violate defendant's right to remain silent); and *State v. Gilbert*, 100 N.M. 392, 402, 671 P.2d 640, 650 (1983) (holding that the language of Section 31–20A–6(A) was not unconstitutionally vague and indefinite). As to the final issue, this Court held explicitly in *Garcia*, 99 N.M. at 777, 664 P.2d at 975, that the death penalty does not necessarily constitute cruel and unusual punishment. *See also Allen*, 2000–NMSC–002, ¶ 112, 128 N.M. 482, 994 P.2d 728; *Clark*, 1999–NMSC–035, ¶¶ 60–61, 128 N.M. 119, 990 P.2d 793; *Compton*, 104 N.M. at 695, 726 P.2d at 849.

## CONCLUSION

{73} The convictions of Defendant for first degree murder, felony murder, kidnapping, attempted criminal sexual penetration, armed robbery, tampering with evidence, unlawful taking of a motor vehicle, possession of a stolen vehicle, felon in possession of a firearm, escape from jail, and escape from a peace officer are affirmed. The sentence of death is reversed for the reasons set out herein. The case is remanded to the district court for a new sentencing proceeding.

{74} **IT IS SO ORDERED.**

MINZNER, C.J., and MAES, J., concur.

BACA and PATRICIO, JJ., (concurring in part and dissenting in part).

SERNA, Justice (concurring in part and dissenting in part).

{75} I concur in all aspects of the majority's well-reasoned opinion except Section XIII, discussing the influence of arbitrary factors. I do not believe that the jury's decision to sentence Defendant to death was influenced by an arbitrary factor. I must therefore respectfully dissent from the majority's reversal of Defendant's death sentence.

{76} This Court has previously held that victim impact evidence is permissible under the Capital Felony Sentencing Act. In order to assess a potential constitutional violation in the admission of victim impact evidence, we apply the standard in *Payne* and determine whether Defendant received a fundamentally unfair trial. *See Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In *Payne*, 501 U.S. at 822, 111 S.Ct. 2597, the Supreme Court explained the necessity for allowing the sentencing body to hear relevant evidence regarding both the defendant and the circumstances of the crime, including the effect of the murder on the victim's family.

{77} The testimony concerning the magazine subscriptions was relevant and admissible as victim impact evidence in order to show how the victim's mother was coping with the murder of the victim. *See State v. Allen*, 2000–NMSC–002, ¶ 60, 128 N.M. 482, 994 P.2d 728 (concluding that victim impact evidence may include a victim's family members' "reactions to learning of the victim's death and their efforts to cope with the loss occasioned by the victim's death" (citation omitted)); *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir.1998) (similar). Victim impact evidence is clearly admissible

to demonstrate the effect of the murder on the victim's family. *Payne*, 501 U.S. at 822, 111 S.Ct. 2597 (noting that victim impact evidence is relevant in "demonstrating the loss to the victim's family"). I believe that how the family was managing their grief is properly before the sentencing jury, and the subscription, as a reminder of the victim's death, was the intentional interference by Defendant in the grieving process of the victim's mother. For example, a family may testify that neutral objects belonging to the victim remind them of the loss and thus cause pain. *Cf. McVeigh*, 153 F.3d at 1220 (permitting a family member's testimony regarding a particular coffee cup and wedding ring which served as a constant reminder of the murder and loss of the victim).

{78} I feel that the evidence allows the victim's mother to put her grief in context; the magazine subscriptions were particularly painful to the victim's mother precisely because they were sent by her daughter's murderer. Just as the grief caused by the receipt of any magazine subscription addressed to the victim can be characterized as a circumstance of the crime because it shows the ongoing pain and suffering resulting from the murder, I believe it is appropriate to include as a circumstance of the crime that the perpetrator sent the magazines to torment the victim's family. Defendant's later action of sending the magazines can be described as reprehensible only because of his earlier crime and the initial pain inflicted on the victim's family. This is not a new harm to the victim's mother but the reopening of an old wound. It was Defendant's intentional, heinous crime that caused the victim's mother's grief, and his decision to send the magazine subscriptions was a deliberate choice to inflame the mother's pain from the loss of her daughter. Defendant, through his own intentionally harmful act, should not be permitted to remove from the jury's consideration the victim's mother's efforts to cope with the loss of her daughter and the obstacles to those efforts. "*Payne* specifically allows witnesses to describe the effects of the crime on their families." *McVeigh*, 153 F.3d at 1221, *quoted in Allen*, 2000–NMSC–002, ¶ 60, 128 N.M. 482, 994 P.2d 728. I believe that the jury is entitled to hear victim impact evidence which demonstrates the effect of the murder on the family and the family's attempt to cope with the loss; the magazine subscriptions were relevant and permissible as a negative reminder of the mother's loss. *See Payne*, 501 U.S. at 825, 111 S.Ct. 2597 ("We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.").

{79} As a constitutional matter, *Payne* establishes a stringent standard for reversal with respect to victim impact evidence: whether it is so unduly prejudicial that the defendant received a fundamentally unfair trial. *See Payne*, 501 U.S. at 824, 111 S.Ct. 2597. Although I believe that trial courts should use great caution in evaluating the admissibility of this type of evidence, I do not believe that the evidence of the magazine subscriptions deprived Defendant of a fair trial. *Cf. McVeigh*, 153 F.3d at 1220 (permitting victim's family member to testify that "there was a point where I actually stuck a pistol in my mouth" because of the grief he felt at the loss of a pregnant wife).

{80} Beyond the issue of victim impact evidence, I believe that the evidence is also admissible for another purpose under the CFSA. Under the plain language of the CFSA and this Court's precedent, I believe that the jury was entitled to consider the magazine subscriptions as evidence of the defendant.

{81} As noted by the State, Section 31–20A–2(B) provides that the jury should consider "both the defendant and the crime" in determining whether to impose a sentence of death. By contrast, Section 31–20A–1(C) states that "all evidence admitted at the trial shall be considered and additional evidence may be presented as to the circumstances of the crime and as to any aggravating or mitigating circumstances." Although Section 31–20A–1(C) specifically addresses the subject of evidence, I do not believe that it serves as the only source of permissible evidence under the CFSA. Under this Court's precedent, under the traditional understanding of a sen-

tencing proceeding, and under principles of statutory construction, I believe that Section 31–20A–2(B) and our Rules of Evidence authorize evidence of the defendant.

{82} In *Clark v. Tansy*, 118 N.M. 486, 492, 882 P.2d 527, 533 (1994), this Court recognized that the prosecution may introduce evidence of future dangerousness in a capital felony sentencing proceeding in its case in chief. Future dangerousness is not evidence that would be admissible during the guilt phase of a trial, it does not constitute a circumstance of the crime, and it is neither a statutory aggravating circumstance nor a statutory mitigating circumstance. Thus, if Section 31–20A–1(C) had been intended by the Legislature to limit the types of evidence admissible in a capital sentencing proceeding, then our discussion of future dangerousness in *Clark v. Tansy* was erroneous. As demonstrated by the Court's unanimous holding in this case regarding evidence of escape, however, this Court properly analyzed the issue of future dangerousness in *Clark v. Tansy*.

{83} The United States Supreme Court has articulated with clarity the reasons that future dangerousness is admissible in a capital sentencing proceeding even without express statutory authority:

This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system.

Although South Carolina statutes do not mandate consideration of the defendant's future dangerousness in capital sentencing, the State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances. Thus, prosecutors in South Carolina, like those in other States that impose the death penalty, frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison.

Arguments relating to a defendant's future dangerousness ordinarily would be in-

appropriate at the guilt phase of a trial, as the jury is not free to convict a defendant simply because he poses a future danger; nor is a defendant's future dangerousness likely relevant to a question whether each element of an alleged offense has been proved beyond a reasonable doubt. But where the jury has sentencing responsibilities in a capital trial, many issues that are irrelevant to the guilt-innocence determination step into the foreground. The defendant's character, prior criminal history, mental capacity, background, and age are just a few of the many factors, in addition to future dangerousness, that a jury may consider in fixing appropriate punishment.

*Simmons v. South Carolina*, 512 U.S. 154, 162–63, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality opinion) (citations omitted); *accord Tuilaepa v. California*, 512 U.S. 967, 976–77, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (upholding the consideration of prior criminal activity in a capital sentencing proceeding and stating that "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process"). For these reasons, the State may introduce in its case in chief in the sentencing proceeding evidence of future dangerousness as evidence of the defendant under Section 31–20A–2(B).

{84} In fact, the admissibility of future dangerousness is consistent with the United States Supreme Court's discussion of the type of evidence which must be available to the jury in death penalty cases as a constitutional matter. "In order for a capital sentencing scheme to pass constitutional muster, it must perform a narrowing function with respect to the class of persons eligible for the death penalty[, known as the eligibility phase,] and must also ensure that capital sentencing decisions rest upon an individualized inquiry[, known as the selection phase]." *Jones v. United States*, 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). "What is important at the selection stage is an individualized determination on the basis of . . . the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of ... the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson v. North Carolina,* 428 U.S. 280, 304–05, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (citations omitted). Thus, with respect to an individualized penalty assessment, a capital felony sentencing proceeding is similar to traditional sentencing proceedings. *See State v. James,* 109 N.M. 278, 281, 784 P.2d 1021, 1024 (Ct.App.1989) ("[J]udges have wide discretion in the sources and types of information used to assist them in determining the kind and extent of punishment to be imposed."); *State v. Montoya,* 91 N.M. 425, 426, 575 P.2d 609, 610 (Ct.App.1978) (" 'Highly relevant-if not essential-to [the sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' " (quoting *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949))); *cf. People v. Mulero,* 176 Ill.2d 444, 223 Ill.Dec. 893, 680 N.E.2d 1329, 1342 (1997) ("[I]t is important [in capital cases] that the sentencing authority possess the fullest information possible with respect to the defendant[ ] ... and the circumstances of the particular offense. The only requirement regarding admissibility of evidence at this stage is that it be relevant and reliable, the determination of which lies within the sound discretion of the trial judge." (citations omitted)).

{85} I believe that the Legislature was aware of the traditional considerations applicable in sentencing proceedings, as well as the defendant's constitutional right to present character evidence, at the time it enacted Section 31–20A–2(B). *See State ex rel. Human Servs. Dep't (In re Kira M.),* 118 N.M.

563, 569, 883 P.2d 149, 155 (1994) ("We presume the legislature is aware of existing law when it enacts legislation."). In *Allen,* for example, this Court held that Section "31–20A–2(B) of the CFSA already provided statutory authority *for the admission of [victim impact] evidence* in death penalty cases in New Mexico courts prior to the effective date of the crime victim's rights laws." *Allen,* 2000–NMSC–002, ¶ 53, 128 N.M. 482, 994 P.2d 728 (emphasis added). Thus, by providing that "both the defendant and the crime" be considered in a sentencing proceeding, I believe that the Legislature intended that relevant evidence concerning the defendant be admissible during a sentencing proceeding in order to enable the jury to make an individualized determination based on the most complete relevant evidence available.

{86} The sentencing jury in a death penalty case is instructed that "[i]n deciding the sentence you must consider all of the evidence admitted at trial and all of the evidence admitted during this sentencing proceeding." UJI 14–7012 NMRA 2000 (brackets omitted). The jury is told that argument of counsel during opening statements and closing argument is not evidence. UJI 14–7010 NMRA 2000; UJI 14–7012. The jury is further told that it must not consider any information learned about the case outside of the courtroom. UJI 14–7010. Finally, the jury is instructed to determine the sentence based on, *inter alia,* "both the defendant and the crime." UJI 14–7030 NMRA 2000. If the jury's sentencing determination is limited to evidence presented at trial and at the sentencing proceeding, then in order to effectuate the intent of the Legislature that the jury consider "the defendant," Section 31–20A–2(B), it must be permissible under the CFSA to introduce evidence of the defendant. Otherwise, the Legislature's reference to "the defendant" in Section 31–20A–2(B) would become mere surplusage. *See Katz v. New Mexico Dep't of Human Servs.,* 95 N.M. 530, 534, 624 P.2d 39, 43 (1981) ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous."). As a matter of statutory construction, I believe the evidence of the magazine

subscriptions was admissible as evidence of the defendant under Section 31–20A–2(B).[1]

{87} It seems to me that the majority's primary reason for reversing Defendant's sentence of death is that the evidence of the magazine subscriptions is so prejudicial that it should not have been admitted. Although this is a wholly legitimate concern, I believe it is more appropriately addressed under our Rules of Evidence instead of under the CFSA. *Cf. Allen,* 2000–NMSC–002, ¶¶ 54–60, 128 N.M. 482, 994 P.2d 728 (discussing the applicability of certain evidentiary rules to capital felony sentencing proceedings and concluding that the defendant was not "unfairly prejudiced" by the victim impact evidence introduced by the State).

{88} Under Rule 11–403 NMRA 2000, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." In order to determine that the trial court erroneously admitted the evidence under Rule 11–403, however, this Court must conclude that the trial court abused its discretion despite the wide latitude which the trial court possesses in such matters. *See State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991) ("The trial court is vested with great discretion in applying Rule 403, and it will not be reversed absent an abuse of that discretion."). For the following reasons, I do not believe that the trial court abused its discretion in admitting the evidence of the magazine subscriptions.

{89} I agree that the evidence of the magazine subscriptions is prejudicial to Defendant. Nonetheless, the evidence has significant probative value for a number of reasons. First, the evidence is probative of future dangerousness. Because the evidence could demonstrate that Defendant took pleasure in inflicting the pain associated with his initial crime and that Defendant sought to exacerbate the mother's pain while in prison, the jury would be entitled to infer from the evidence an increased likelihood that Defendant would be dangerous in the future.

{90} Second, Defendant introduced evidence of his character as a child and teenager in order to shift the blame for his actions upon his family and upbringing and to imply that he was not responsible for his actions and is somehow less culpable. At the sentencing hearing, Defendant presented a parade of witnesses who testified that he was a sweet, nonviolent boy in his youth. *See* NMSA 1978, § 31–20A–6(C) (1979) (capacity to appreciate criminality of his or her conduct as a mitigating circumstance). Throughout the approximately 125 pages of transcript testimony, family members, including his grandfather, parents, step-grandparents, and aunt, testified regarding poor parenting, and some individuals mentioned learning disabilities. This is in contrast to a mere thirteen pages of victim impact testimony from the victim's mother, and four pages of victim impact testimony from a family friend of the victim's mother. Further, a defense witness testified that he knew Defendant between 1988 and 1990, approximately four years prior to the murder, and that he did not "see hostility" or a "temper" in Defendant, and that "kids made mistakes." Defendant thus placed the issue of his character before the jury, although defense counsel obviously wished to limit the evidence to Defendant as a child and as a teenager, and I believe the State was entitled to rebut the testimony through which Defendant attempt-

---

1. Notwithstanding this construction of the CFSA, I do not believe that it is clear that the Legislature would have the authority to prescribe evidentiary rules for a sentencing proceeding; once the Legislature made the substantive policy choice in Section 31–20A–2(B) that the jury is to consider "the defendant and the crime," any statutory limitation on the admissibility of evidence relevant to these issues would be in danger of violating the principle of separation of powers due to an inconsistency with the Rules of Evidence. *See Allen,* 2000–NMSC–002, ¶ 54, 128 N.M. 482, 994 P.2d 728 (discussing the applica-

bility of the Rules of Evidence to a capital felony sentencing proceeding and citing *Ammerman v. Hubbard Broadcasting, Inc.,* 89 N.M. 307, 311–12, 551 P.2d 1354, 1358–59 (1976) for the proposition that "the power to prescribe rules of evidence and procedure is constitutionally vested in this Court"). "It is, of course, a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions." *Lovelace Med. Ctr. v. Mendez,* 111 N.M. 336, 340, 805 P.2d 603, 607 (1991).

ed to place the blame for his actions upon his family and upbringing.

{91} The magazine subscriptions demonstrated that Defendant was morally culpable for the murder and continued to inflict pain and suffering associated with the murder. *Cf. State v. Cooper*, 151 N.J. 326, 700 A.2d 306, 344 (1997) (testimony of a psychiatrist properly admitted to rebut background and traumatic childhood as mitigating circumstances). This evidence placed Defendant's assertions that he was a "sweet boy" in their proper context.

{92} Third, under the CFSA, Defendant was entitled to introduce as a mitigating factor evidence of a likelihood that he could be rehabilitated. Section 31–20A–6(G). Defendant in fact chose to do so. Defendant presented testimony that he had been seeking redemption. Defense counsel argued to the jury that Defendant was "a sweet little boy," who "exaggerates," and that in this case "this story is about a boy who, when he's punished, invents for himself, a place where he is the king, where he is the most important, where he is in charge of everything." She argued that he "invent[ed] himself in response to a life of punishment and loneliness." Defense counsel also asked the jury whether "a killing, another death [is] really a fitting legacy for a young woman's life?" She argued that Defendant was not "beyond redemption, that he has not all his life been who you may think he is now," that he was once a sweet two-year-old, and that "[e]ven as recently as five or six years ago," his actions are those of a "young man who is still seeking redemption." By saying that Defendant is not beyond redemption, I believe that Defendant was attempting to invoke as a mitigating circumstance a likelihood that Defendant could be rehabilitated. The State should be permitted to respond to this argument. The magazine subscriptions are relevant to rebut Defendant's suggestion of amenability to rehabilitation.

{93} Based on the considerable probative value of this evidence, I do not believe the trial court abused its discretion in concluding that the probative value was not substantially outweighed by any unfair prejudicial impact. *See State v. Rojo*, 1999–NMSC–001, ¶ 48, 126

N.M. 438, 971 P.2d 829 ("In determining whether the trial court has abused its discretion in applying Rule 11–403, the appellate court considers the probative value of the evidence, but the fact that some jurors might find this evidence offensive or inflammatory does not necessarily require its exclusion.") (citation omitted); *cf. State v. Ard*, 332 S.C. 370, 505 S.E.2d 328, 332 (1998). The trial court's decision to admit the evidence concerning the magazine subscriptions does not contravene constitutional principles, statutory requirements, or evidentiary rules. This evidence was properly before the jury, and I do not believe that the jury's sentencing determination was based on an arbitrary factor or was the product of passion or prejudice. Therefore, I respectfully dissent from Section XIII of the majority opinion discussing the influence of arbitrary factors. I would affirm Defendant's sentence.